OVERSHINER v. PALMER. (No. 950.)

(Court of Civil Appeals of Texas. Amarillo. March 29, 1916. On Motion for Rehearing, April 19, 1916.)

1. BROKERS ⬉71—RIGHT TO COMPENSATION —EXPRESS CONTRACT—NET.

Where a broker sent a telegram to his principal containing an offer, in behalf of a third party, of a price for his land "net," and the principal answered by wire that he would accept the price offered "net," an express contract was concluded between the parties, and no implied contract will arise out of its performance for the payment of a broker's fee.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 56; Dec. Dig. ⬉71.]

2. WORDS AND PHRASES—"NET."

The word "net" means free from charges or deductions; obtained after deducting all expenses.

Appeal from Hemphill County Court; J. L. Jennings, Judge.

Action by W. A. Palmer against A. C. Overshiner. Judgment for the plaintiff, and defendant appeals. Reversed and rendered.

Hoover & Dial, of Canadian, for appellant. J. W. Sanders and Fisher & Palmer, all of Canadian, for appellee.

HENDRICKS, J. Palmer, the appellee, sued Overshiner, the appellant, for real estate commissions, alleged to have accrued by virtue of an express contract for the payment of 5 per cent. on account of the sale of 800 acres of land, as Overshiner's agent.

In certain preliminary negotiations between appellant and appellee, Overshiner priced 640 acres of the land at $12.50 per acre, and 160 acres of the land at $15 per acre, with a further reduction at a subsequent date to $11 per acre, for 640 acres, and $12.50 for the 160-acre tract. In the first reduction of price Overshiner stipulated that Palmer's commission was "to come out of the first payment." In the letter evidencing the second reduction of the price of the land, Overshiner stated to appellee, "Your commis-

sion to be added to the first payment." On August 26, 1915, Palmer sent the following telegram to Overshiner, who resided in Hopkinsville, Ky.:

"Have offer $10.00 acre for eight hundred acres, twenty-one hundred dollars cash, net you. Balance in four annual payments six per cent. interest. Will you accept offer? If not, wire proposition at once. Responsible party offers above."

Overshiner answered this telegram on August 27th as follows:

"Will accept $10.00 net, you furnish abstract without cost to me. Answer."

Plaintiff answered on the same day:

"Your wire this date. Proposition accepted. Will be closed immediately."

[1] The negotiations prior to the time of the telegraphic communications above, of course, show the agency of Palmer to sell the land. When Palmer sent the first telegram of August 26th, it communicated an offer of some unknown party for 800 acres of land at a price of $10 per acre, $2,100 cash, net to the owner, and the balance in four annual payments. On the face of it, this telegram simply means a proposition of $2,100 cash and four annual payments of $1,475 each. The telegram in response is plain that Overshiner would accept $10 net, Palmer to furnish abstract without cost to him. When Palmer accepted this proposition by telegram of the same date, the transaction and contract between Palmer and Overshiner were concluded.

[2] "Net" means free from charges or deductions; obtained after deducting all expenses; a telegram sent by plaintiff, offering to sell butter to defendant, for 17 cents per pound, "net to us," means that the price is to be 17 cents, free from all charges and deductions. Floral Creamery Co. v. Dillon, 83 Conn. 65, 75 Atl. 82.

Where one states to a broker that he will sell land for a certain sum "net" to him, the broker, on procuring a purchaser, is entitled to no commission unless the sum received exceeds the specified net price; the word "net" meaning that which remains after deducting all charges and outlay. Wolverton v. Tuttle, 51 Or. 501, 94 Pac. 963. See, also, Allen v. J. A. Clopton Realty Co., 135 S. W. 242, 243; Turnley v. Micheal, 15 S. W. 912.

When appellant telegraphed that he would accept $10 net, Palmer to furnish the abstract, and Palmer thereafter accepted this proposition, it necessarily meant $8,000 net to Overshiner in part money and part deferred consideration, without any deduction; the rights of the parties had accrued and become consummated by a written contract. Palmer, on August 27th, the same day he sent his telegram of acceptance, wrote Overshiner, confirming his wire of that day, quoting the exact language of same, saying also that he inclosed a warranty deed for execution. In this letter he instructed Overshiner

to send the deed to the Canadian State Bank, with instructions to deliver to the purchaser "upon his payment to you of $2,100 cash, and four vendor lien notes, for the sum of $1,375 each, * * * due in one, two, three, and four years, respectively, with the usual attorney's fees clause." Overshiner did not reply to this letter, but his home bank at Hopkinsville, Ky., evidently instructed the Canadian Bank to remit $2,500, instead of $2,100. The deed forwarded by Palmer to Overshiner recited a cash consideration of $2,500, and on September 4th following Palmer telegraphed Overshiner that his bank at Hopkinsville had instructed the Canadian Bank to remit $2,500 to close the deal, asking him to correct the mistake by wiring the Canadian Bank to accept only $2,100 and pay him $400. Overshiner telegraphed Palmer that his proposition was to take $10 per acre net, Palmer to furnish abstract, and that he (Palmer) had accepted this proposition, and that if the cash payment was only $2,100, the notes should be for $5,900, to which Palmer replied, insisting upon 5 per cent. commission for the sale of the land. How the plain contract, as evidenced by the telegrams, could be changed by Palmer's letter, and Overshiner's price of $10 net for the land reduced to $7,600 without a sufficient consideration, is not clear. The contract between the parties, in unambiguous language, had been closed, and their rights matured. Of course there are numerous authorities that a broker, where he is not operating under an express contract, but under an implied agreement, is entitled to a reasonable compensation for his services; that is not this case. Palmer predicates his suit upon an express contract, based upon a specific agreement of 5 per cent. commission. After the contract had matured, and the rights of the parties accrued, the broker cannot change, by deductions, the net purchase price to the owner, without a new contract. When Palmer sent his telegram, accepting Overshiner's offer of $10 net for the land, there was no condition attached to this acceptance, but it was unequivocal. Palmer thereafter did not earn $400 upon an implied contract, or quantum meruit, and Overshiner rejected Palmer's construction of the contract. The deed forwarded, reciting $2,500 cash, and the deferred vendor lien notes of $1,375, was a compliance with Overshiner's proposition, and unless there was a new contract or creation of additional rights growing out of an implied obligation, on account of Palmer having learned something additionally, by virtue of a new arrangement, Overshiner had the right to close his contract. If Palmer had signed a written contract with Teas, the purchaser, with the authority from Overshiner, the latter would have been compelled legally, by specific performance, to have closed it; and he had the

moral right to do so, at least, unless there was a change with a subsequent meeting of minds between the parties, or something thereafter earned upon an implied contract.

Overshiner had reduced the price of the land to a net price to him, without any new rights created. We are sure that appellee has a sincere conception of his rights, and if this case, and the record, were so presented as that we thought there could be a possible showing of quantum meruit, we would reverse and remand, instead of rendering the judgment of the trial court. In this character of case the express contract, evidenced by the telegram, with nothing thereafter done between the parties, creating in Palmer any new or independent rights, negatives an implied contract. "If there was an express contract, there could be no implied contract arising out of the acts of performance of it; the one is destructive of the other. Two things which cannot coexist will not constitute one and the same thing." Lumber Co. v. Water Co., 94 Tex. 464, 61 S. W. 707. Being convinced that an express contract as sued upon by appellee for $400 commission, does not exist in this case, permitting the commission, and that no implied contract could, under law, arise, we reverse and render the case in favor of appellant, against appellee, and render such judgment as the lower court should have rendered.

Reversed and rendered.

### On Motion for Rehearing.

When we reversed and rendered this cause upon the whole case and stated that we would not reverse and remand, upon a quantum meruit, the opinion is probably misunderstood by both parties. We meant that as to the commissions only for the sale of the land exclusively applied to that proposition, this record exhibits that there is no such thing as an implied contract, or a quantum meruit, for the reason that it is unequivocally shown that an express contract unconditionally existed between the parties. That contract was a certain amount for the land, "net" to Overshiner. An express contract of the amount net to Overshiner destroys any alleged implied contract out of that same sum. Elliott on Contracts, vol. 2, § 1360; Enc. of L. & Proc. vol. 9, p. 242, and citations; Gammage v. Alexander, 14 Tex. 414, and particularly the case of Lumber Co. v. Water Co., 94 Tex. 464, 61 S. W. 707, cited and quoted from in the original opinion. If an attempt were made to prove an implied contract, or quantum meruit, as applied to commissions, the express contract would destroy it.

As to the proposition held by us of unconditional offer and unconditional acceptance—which is the condition of the record here—appellee's authorities are inapplicable.