Argued March 10, decided April 14, 1908.

## WOLVERTON *v.* TUTTLE.

[94 Pac. 961.]

BROKERS—COMMISSIONS—SALE OF LAND.

1. To enable a broker to recover a commission for the sale of land, it is only necessary to show his employment, either express or implied, to sell the land, and that he was instrumental under such employment in bringing the buyer and seller together.

SAME—NOTICE FROM VENDOR—PRESUMPTION.

2. Where a broker is notified by a vendor that he will pay no commissions, and thereafter continues the negotiations for the sale, it is presumed that he is the agent of the purchaser and looks to him for his commission.

SAME—SALE FOR NET PRICE—"NET."

3. Where one states to a broker that he will sell land for a certain sum "net" to him, the broker on procuring a purchaser is entitled to no commission unless the sum received exceeds the specified net price; the word "net" meaning that which remains after deducting all charges and outlay.

SAME—CONTRACT WITH BROKER—CONSIDERATION.

4. A husband agrees with brokers to sell for a certain net price land to which his wife held the legal title, refusing to pay any commission on a sale for that price. The brokers brought together the husband and the buyer, the net price named was agreed on, part thereof was paid by the buyer, and a written memorandum sufficient to bind the parties was executed. Thereafter the wife, who was not fully advised of the situation, agreed to pay the brokers a commission in case the deal went through. *Held*, that the sale having been already completed, the promise was without consideration.

From Multnomah: ARTHUR L. FRAZER, Judge.

Statement by MR. COMMISSIONER KING.

This is an action to recover a commission on the sale of lot 9 in block 86 in Portland, Or., conveyed by defendants to John Manning and L. H. Tarpley for $20,000. The complaint, in substance, avers that plaintiffs are real estate brokers, and, at the special instance and request of defendants, were instrumental in bringing about the sale; that $550 is a reasonable commission to be charged for their services, and is the usual and customary rate charged in that city for like sales, for which sum they prayed judgment.

An answer placed the cause at issue. By consent of the parties the cause was tried before the court without a jury, resulting in a judgment for plaintiffs in the sum demanded. Hence this appeal.

The record discloses that Manning and Tarpley wanted to purchase the property and told plaintiffs they would give $20,000 for it, and, as evidence of good faith, executed a check to Bruce Wolverton for $50. With a view to handling the property for the owner, plaintiffs were soon in communication with George Tuttle. He at first hesitated to name a price, and when asked by Kinsell, "How would $17,500 do?" said that he had refused $18,000, but would take $20,000. The question of commissions then arose, as to which he said, "That will have to be net to me," and concerning which Kinsell testified: "I told him the regular commission on that deal, if we made it go at that price, would be $550, and that he was getting a good price for his property, $20,000; but I said: 'I can't close this matter up here until I see my principal again.' He said: 'All right; when will you know?' I said: 'This afternoon I will know.' And he said: 'I will be down town, and I will stop at your office and get your answer.'" They met at the office at the agreed time. Wolverton was there and was introduced to Tuttle, and, as soon as the deal was mentioned, informed him that they must have a commission if the deal went through, as they could not work for nothing, having office expenses to pay, etc., to which Tuttle replied: "I understand that. I want $20,000 net." Wolverton then said: "Well, we will take you over and see if you can't arrange between you about paying the commission." Acting on this suggestion, they went to Tarpley's office, nothing further being said on the way. When they reached his office Manning was telephoned for, and after his arrival the question of commission was again called up. Concerning this conversation Kinsell testified:

"Q. Was there anything said by you agents about paying the commission or either of you?
A. I think Mr. Wolverton did most of the talking. I do not remember the exact words.
Q. Was he insisting on a commission, or insisting he would have a commission if the deal went through?

A. Yes, sir; he was fighting for a commission, and finally Mr. Tuttle said to Mr. Manning and Mr. Tarpley: 'Gentlemen, I will let this matter rest until Wednesday of next week for you to decide.' Mr. Manning, I believe it was, said: 'We will take the property. There is no use putting it off'—and handed over a check and dictated a receipt. At that time it developed, when he was dictating the receipt, Mr. Manning, I believe, asked Mr. Tuttle whether the property was in his name; and Mr. Tuttle said, 'No; it is in my wife's name,' he said. 'Your wife has been consulted about this?' asked Mr. Manning, 'and she will sign the deed?' Mr. Tuttle said: 'Yes; she is willing'—and finished writing the receipt, and fixed the details of the deal as to the amount to be paid in cash, etc., and finally instructed Mr. Manning—told Mr. Tuttle to sign his wife's name, as agent, or to be agent to sign her name; and that is about all I know of that over there. We left them.

Q. During the time they were in your office, just prior to the time you started over to Mr. Tarpley's office, Mr. Wolverton, in his conversation with Mr. Tuttle, insisted all the time he was to have a commission if he sold the property to his client? * * What were the facts about the conversation between Mr. Wolverton and Mr. Tuttle, the conversation they had about the commission before going to Mr. Tarpley's office?

A. I have stated it substantially as I could, in my office, you mean?

Q. Yes.

A. Mr. Wolverton stated very plainly to Mr. Tuttle that our parties were willing to pay $20,000, but no more, and said we could not work for nothing. The regular commission on that would be $550. Mr. Tuttle said: 'Yes; you, of course, have your expenses to pay as well as any one else who has an office.' And I don't remember whether there was anything else particularly said, any more than that Mr. Wolverton said we would go over and get the parties together. He suggested to Mr. Tuttle to go over to Tarpley's office and see if it would not be arranged between them about this commission."

Within a few minutes after the parties were brought together in Tarpley's office, the terms of the sale were agreed upon, and $50 was paid to Tuttle to bind the bar-

gain, and a receipt given therefor, signed "Mary Tuttle, by George Tuttle," to the effect that this sum was paid as a part of the purchase price of the lot, and that she agreed to furnish an abstract to the property and give a good and sufficient warranty deed thereto upon the payment of $10,000 cash, the balance to be secured by a first mortgage on the property. The check formerly given to Wolverton was by him indorsed and delivered to Tuttle in payment of the $50 mentioned. After meeting at the office, and before this transaction took place, the question of commission was mentioned, and Manning and Tarpley indicated that they would not pay more than the $20,000 and would pay no commission, while Tuttle maintained he would accept nothing less than "$20,000 net." After the check was exchanged for the receipt a commission was demanded of Tuttle by plaintiffs, which Tuttle refused. When the receipt was given it was learned for the first time that Mrs. Tuttle held the legal title to the property. Plaintiffs then called upon her, and, after explaining that the deal had been made, and that they were instrumental in bringing it about, told her that they were entitled to, and expected, a commission for their services. To this Mrs. Tuttle replied, in effect, that they should have a commission, which would be paid if the deal went through. A deed to the property was thereafter executed to the purchasers in accordance with the terms of the receipt mentioned. Plaintiffs then demanded the commission in question, which was refused, resulting in this proceeding.

For appellant there was a brief and an oral argument by *Mr. William W. Banks.*

For respondent there was a brief with oral arguments by *Mr. Oglesby Young* and *Mr. V. K. Strode.*

Opinion by MR. COMMISSIONER KING.

1. The only question necessary for determination is as to whether the motion for nonsuit was properly overruled, and if there was sufficient evidence adduced at the trial

to sustain the judgment. It is well settled that, to enable a real estate broker to recover a commission for the sale of land, it is only necessary to show his employment, either express or implied, and that he was instrumental under and by virtue of such employment in bringing the buyer and seller together: *Good* v. *Smith,* 44 Or. 578 (76 Pac. 354). It is necessary, however, that sufficient facts be established by the proof to show that the real estate broker was employed for that purpose, either by express agreement, or that sufficient was done and said to enable the jury, or court sitting as such, to imply an agreement to that effect.

The testimony as first given by Wolverton, in his direct examination, to the effect that he said to Tuttle, in reference to going over to Tarpley's office, that he could go over with him if he wished, and that he would introduce him to the purchaser, but that if he did so he must have a commission in the event the sale should go through, and the statement of Kinsell to the effect that, in his first interview with Tuttle in reference to the property, Tuttle told him to ascertain what was the best price his people would give for the property, standing alone would be sufficient to make a *prima facie* showing to the effect that they were employed by Tuttle to bring about the sale. This, however, must be construed in connection with other testimony and statements of the plaintiffs when testifying in their own behalf, in which they clearly state that Tuttle insisted that he would pay no commission, but must receive $20,000 net for the property. This *prima facie* showing, therefore, is overcome by their own testimony; and whatever may have been the understanding between the plaintiffs, or their intention in reference thereto, among themselves, in consummating the deal, it is obvious and, in fact, established beyond question, that Tuttle did not agree or intend to pay any commission whatever. It is immaterial that he went to the office of the purchaser in company with the plaintiffs. True, they

stated to him that if he went along they would expect a commission, but this is also overcome by the further statement to the effect that they thought if he would go over to see Tarpley and Manning, they could probably make satisfactory arrangements with the purchasers for the payment of the commission, and that Tuttle expressly stated that, while he realized they could not work for nothing and must pay office expenses, etc., he would not make the sale unless he received the full purchase price net to him.

2. From the testimony given we think it impossible to draw any other inference than that Tuttle, by his insistence that he must have the sum mentioned net to him, meant that he would pay no commission, and expected that the real estate brokers would either secure their compensation from the purchaser for their profits, or could depend upon such sum as they might receive in excess of the net price stated, and as to which it would be immaterial to the vendor. When a broker is notified by the vendor that he will pay no commissions, and, after receipt of such notice, the broker continues the negotiations for the sale, it is presumed that he is agent of the purchaser, and looking to him for his compensation: *Synnott* v. *Shaughnessy*, 130 U. S. 572, 580 (9 Sup. Ct. 609: 32 L. Ed. 1038). Tuttle had a right, therefore, to act upon this presumption, and, after giving such notice, to assume that plaintiffs were expecting either their commission from the purchasers or a greater sum than that demanded by him in the transaction. His price was $20,000 regardless of who became the vendee. Accordingly it was immaterial to the vendor whether the brokers paid the purchase price and took over the property and then sold to their customers for a greater sum, or whether the conveyance should be made direct to plaintiff's purchasers; for, in any event, as stated in *Synnott* v. *Shaughnessy*, it was immaterial to Tuttle what plaintiffs should get for it. He had stated his price in a net sum.

3. As held in *Evans* v. *Waln*, 71 Pa. 69, the phrase "net profits," as applied to the proceeds of the sale of stock, means, in commercial usage, the balance of the proceeds after deducting the expenses incident to the sale. In *Scott* v. *Hartley*, 126 Ind. 239 (25 N. E. 826), the word "net" is defined as "that which remains after the deduction of all charges and outlay, as net profits," etc.

A case very similar to the one under consideration is *Beatty* v. *Russell*, 41 Neb. 321 (59 N. W. 919), in which the vendor, when asked by a real estate broker as to the terms on which he could sell his farm, "told him they might sell it for $4,800 to me net"; that the price was $5,000, but the agent might sell it so as to realize him the net sum named. The farm was sold for $4,800 and no more, for which commission was demanded, but refused. In passing upon the question the court there held that the testimony established that the contract made at the time gave the broker authority to sell the land for the sum of $4,800 net to the owner, and the agent was to have as commission any sum in excess of that amount, observing that this view of the case precluded the agent from any claim to a commission when the price obtained did not exceed that named; that the commission or compensation for effecting the sale was to be measured "by the sum received in consideration for the land in excess of $4,800"; and that the vendor "having named to the purchaser this sum as the amount required to buy the farm, there could be and was no excess, and hence no commission."

Notwithstanding the rule that, where a sale is effected through the efforts of a broker or information derived from him, so that he may be said to be the procuring cause, the law leans to that construction of his contract with the vendor which will secure the payment of his commission, rather than to the contrary construction (*Bell* v. *Siemens & H. E. Co.* 101 Wis. 320, 323: 77 N. W. 152), we are of the opinion, as announced in *Beatty* v.

*Russell,* that the use of the expression "net" to the vendor necessarily precludes any inference that Tuttle was to pay a commission in the event of a sale, unless the sum received should exceed the specified "net" price. It can only be inferred that plaintiffs were either to look to this excess, if any, or to the purchasers for their compensation. After such notice by Tuttle plaintiffs necessarily acted at their peril in bringing the buyer and seller together without an understanding in respect to their commission.

4. It is further urged that Mrs. Tuttle, by her statements, ratified her husband's acts, and this appears to have been the opinion of the circuit court. This, however, overlooks the governing feature that the proved facts rebut any inference that Tuttle either expressly or impliedly agreed to pay any commission, except such as might have been received above the net price fixed by him for the property. Any ratification, therefore, of her agent's acts in this respect, cannot strengthen plaintiff's position. In this connection our attention is called to Mrs. Tuttle's statements to the effect that, if plaintiffs were instrumental in bringing about the deal, they were entitled to their commission, and it would be paid if the deal went through, in respect to which it is urged that this constituted a specific agreement on her part to pay the claim. This position might be tenable, if the statements alluded to had been made by her with full knowledge of all the dealings had, and prior to the consummation of the sale; but everything having been done and the sale completed prior to the conversation with Mrs. Tuttle, there was no consideration for her promise, and, whatever view might be taken as to her moral obligation to do as agreed, it was insufficient in law to constitute a binding contract. The purchase price had been agreed upon, part of the consideration paid, and a written memorandum thereof sufficient to bind the buyer and seller had been executed. In fact, all had been done that was possible for the brokers

to do in the matter, thereby constituting what is commonly termed a "consummation of the sale": *Micks* v. *Stevenson*, 22 Ind. App. 475 (51 N. E. 492).

For the reasons given, the judgment of the court below should be reversed, and the cause remanded.

REVERSED.