## MURPHY v. W. & W. LIVESTOCK COMPANY.

(No. 974; Decided February 3, 1920; 187 Pac. 187.)
(Rehearing Denied May 13, 1920; 189 Pac. 857.)

Appeal and Error—Waiver of Error by Failure to Mention in Motion for New Trial—New Trial—Brokers—Broker's Right to Commission—Verdict on Conflicting Evidence Will Not be Disturbed on Appeal,—Evidence—Trial—Instructions.

1. Grounds of error assigned in the petition in error but not specifically mentioned in the motion for a new trial, are waived and cannot be considered in the. Supreme Court.

2. Where, pursuant to an ordinary brokerage contract, the broker has procured a purchaser, ready, willing, and able to buy at the price named, and an enforceable contract is entered into between the owner and the purchaser found by the broker, the broker's commission is at once due and payable, though the contract is never carried out by the final payment of the purchase money. But in an action to recover such commission plaintiff is required to sustain the contract pleaded by him, by a preponderance of the evidence.

3. An appellate court should not reverse a verdict rendered on conflicting evidence.

4. In an action by a broker for commissions for finding a purchaser for ranch lands and livestock, where there was evidence tending to show that plaintiff did not think he was entitled to be paid commissions until defendant had received all of the purchase price, a verdict for the defendant will not be disturbed.

5. In an action by a broker for commissions for procuring a purchaser for lands and live stock, an instruction presenting plaintiff's theory of the case as well as the defendant's is not violative of plaintiff's rights.

ON PETITION FOR REHEARING.

6. Where broker's commission is by contract made dependent upon certain conditions or contingencies, as upon the consummation of sale, or payment of the purchase price or a specified part thereof, or a net price to the owner, these stipulations will govern, and a fulfillment of the prescribed conditions is generally essential to the right of compensation.

7. Where broker's proposal was that he should name $35,000 as price for a ranch, and "after getting $30,000 for you for the ranch, the. $5,000 will be my commission", the extra $5,000, that particular part of the total price to be

named, was to constitute the commission, and broker was entitled to no compensation where purchaser paid first installment of $10,000 and then defaulted.

8. Where a broker's contract of employment provides for net price to the owner or for a commission out of or to consist of the excess above stated price, such contract is generally construed as requiring, as a condition to the right to the agreed commission, an actual or completed sale for an amount exceeding such net or selling price, unless the same has been prevented by the fault of the owner.

9. An answer, in an action by a broker for commission for furnishing purchaser, which denied each and every allegation of the petition not specifically admitted, and alleged that it was agreed that, if plaintiff produced a purchaser who would "purchase" and "pay" for the property at a certain price, then the defendant would pay plaintiff the sum of $5,000, "the difference between the price for which plaintiff was willing to sell and the price plaintiff represented the purchaser produced by him would pay therefor," held, to allege a special contract, and not to admit the contract of employment alleged in the petition, which was based on the general rule that a broker is entitled to compensation when he furnishes a buyer ready, willing, and able to perform.

ERROR to the District Court, Park County; HON. P. W. METZ, JUDGE.

Action by W. W. Murphy against the W. & W. Live Stock Company to recover a broker's commission for negotiating a sale of property. There was a verdict and judgment for defendant and plaintiff brings error.

*R. B. Landfair,* for plaintiff in error.

The action was for a recovery of a broker's commission for finding a purchaser for lands and livestock; the vendor is entitled to reasonable time to investigate the financial standing of an intended purchaser (Smith v. Penn, 151 Ill. 155, 9 C. J. 600); the amount of plaintiff's commission and the fact that he found a purchaser was undisputed. Having found a purchaser, ready and willing to buy, plaintiff's commission was payable at once (Oudluhan v. Baldwin, 11 Cal. 648, 35 Pac. 310; Pape v. Wright, 116 Ind. 502, 19 N. E. 459; McFarland v. Lillard, 2 Ind. App. 160, 28

N. E. 229; Teeford v. Brinkerhoff, 45 Ill. App. 586; Gelatt v. Ridge, 117 Mo. 553, 23 S. W. 882; Cheatham v. Yarborough, 90 Tenn. 77, 15 S. W. 1076; Lunney v. Healey, 44 L. R. A. 593) ; where vendor has made a contract for sale to a person produced by the broker, the solvency and ability of the purchaser to perform the contract will be presumed (Goss v. Brown, 31 Minn. 484; Grosse v. Cooley, 32 Minn. 188; Hart v. Hoffman, 44 How. Pr. 168; Crewier v. Stephens, 40 Minn. 288; Cook v. Kronmeke, 4 Daly, 468; Nichols v. Jones, 23 Nebr. 813; Butler v. Kennard, 23 Nebr. 357; Potvin v. Currin, 13 Nebr. 303; Blakeslee v. Erwin, 40 Neb. 134; Holden v. Stark, 159 Mass. 503; Heaton v. Edwards, 90 Mich. 500, 9 C. J. 596; Wray v. Carpenter, 16 Colo. 271, 37 Pac. 248), and failure of the purchaser to carry out the contract will not deprive the broker of his commissions (Lunney v. Healey, 44 L. R. A. 593; Wray v. Carpenter, 16 Colo. 271, 27 Pac. 248) ; the broker is not an insurer of the purchaser's ability (Payne v. Ponder, 139 Ga. 283, 77 S. E. 32) ; where the vendor accepts a person presented as a purchaser and enters into an enforceable contract of sale with him, the broker is entitled to his commission (Scully v. Williamson (Okla.), 108 Pac. 395, 27 L. R. A. 1089) ; this is especially true if the vendor retains purchase money paid, and does not rescind (Meyer v. Land Co., 126 Minn. 409, 148 N. W. 452; Mayhew v. Brislen, 108 Pac. 253) ; where a principal fixes a net price, the broker to receive all he gets over that sum, he is entitled to a payment of commission on a sale of all over and above the amount fixed as net (Church v. Dunham, 14 Ida. 776, 96 Pac. 203), and he is entitled to payment out of the first payment (Young v. Ruhwedel, 119 Mo. App. 231, 95 S. W. 228; Yoder v. Randol, 83 Pac. 537) ; where no terms of sale are mentioned, and seller sells property, his agent is entitled to commission (Frost v. Houx, 15 Wyo. 353) ; the court should have rendered judgment for plaintiff on his motion (Calkins v. Mining Co., 25 Wyo. 409) ; instruction No. 2 is erroneous. The court erred in refusing instructions offered by plaintiff designated "A" to "L", inclusive;

the court fairly instructed as to plaintiff's theory, but not wholly as to defendant's theory of the case and this was error; plaintiff was entitled to instructions defining the whole law as to brokers, applicable to the facts of the case.

*C. H. Harkins* and *H. C. Brome,* for defendant in error.

The evidence clearly disclosed a misunderstanding as to· the terms of the agreement between plaintiff and defendant and the conduct of plaintiff indicated that he did not believe he was entitled to commissions until defendant had received the full sum of $30,000, being the net price fixed for the ranch; the acts of the parties amounted to a construction placed upon the agreement by themselves and such construction should be adopted by the court (9 Cyc. 589; Hopkins v. Settles, 149 Pac. 890) ; under a contract by which a broker's commission is limited to the excess of the purchase price over a net price to the owner, there is no liability for commission where the purchaser procured is unable to perform the contract of purchase (Martinson v. Hensler, 157 N. W. 714; Robinson v. Ins. Co. 155 Pac. 202; Ford v. Brown, 120 Cal. 551, 52 Pac. 817; Fountain v. Pearson, 201 Fed. 324) ; where the seller has no acquaintance with the proposed purchaser and the broker presents him for the purpose of making an executive contract there is an implied warranty that he has ability to make the purchase (Butler v. Baker, 17 R. I. 582; Iselin v. Griffith, 62 Iowa 668) ; the record does not properly present any question with reference to the giving or refusing of instructions for review by this court; a general assignment relating to a number of special instructions must be overruled if any one was properly given or refused (Dickenson v. State, 18 Wyo. 440) ; there was evidence to sustain the verdict and the judgment should be sustained.

BLYDENBURGH, JUSTICE.

The plaintiff in error, Murphy, brought this suit in the court below to recover from the defendant in error, W. & W. Live Stock Company, a corporation, five thousand five hundred and fifty dollars alleged to be due as commissions for

finding a purchaser for certain ranch lands, leases and sheep. The case was tried to a jury, which returned a verdict for the defendant, upon which judgment was rendered, and plaintiff brings this proceeding in error.

The plaintiff's amended petition contains two causes of action, in the first alleging "that ever since on or about the 15th day of October, 1918, there has been due him from the defendant the sum of fiive thousand dollars ($5,000.00) with interest thereon at 8% on a contract entered into between the plaintiff and defendant whereby on or about the 23rd day of September, 1918, it was agreed by the defendant with the plaintiff that if the plaintiff would find a purchaser for certain ranch lands of defendant's being about 560 acres near Big Trails, Wyoming, together with the leases on about 2,000 acres of land in the same vicinity thereof, at the price of thirty-five thousand dollars ($35,-000), then the defendant would pay the plaintiff the sum of five thousand dollars ($5,000.00). That the plaintiff produced a purchaser ready, willing and able to pay the price fixed and on or about the 15th day of October, 1918, terms of sale were agreed upon between defendant and said purchaser, one Fred Eberhard, and an enforceable contract executed between them for the sale of the said land and leases and under the terms of said contract the defendant received and retained the sum of ten thousand dollars cash at the time of the execution thereof from said purchaser, Eberhard; when, at which time, the sum of five thousand dollars became due and payable to plaintiff from defendant; yet defendant, though requested, has not paid any part thereof."

The second cause of action is in the same general language except it is alleged that the plaintiff was to find a purchaser for certain sheep at $17 per head; that he did produce a purchaser for 2,200 head of sheep ready, willing and able to purchase the same and that defendant agreed with plaintiff that 25c per head was a reasonable commission therefor. The defendant answered the first cause of action first by a general denial and then after admitting its corporate exist-

ence alleged in substance that the plaintiff stated to defendant that he had a purchaser for defendant's ranch lands near Big Trails, Wyoming, and for a band of breeding ewes kept on or near said ranch and inquired what commission defendant would be willing to pay plaintiff if said purchaser should be induced by plaintiff to purchase and pay for said property. That defendant advised plaintiff that it was willing to sell said ranch property for $30,000 and said sheep for $17.00 per head, and that defendant would not pay any commission at the price named and if plaintiff procured a purchaser at the price named he must obtain any commissions for his services from such purchaser. That thereupon plaintiff represented he had a purchaser who would pay $35,000 for the ranch, $17.00 per head for the sheep, and thereupon defendant agreed with plaintiff if plaintiff produced a purchaser who would purchase and pay for the property at the prices named then the plaintiff should receive the sum of $5,000, the difference between the price for which plaintiff was willing to sell and the price plaintiff represented the purchaser produced by him would pay therefor. Then it is alleged the plaintiff represented that the proposed purchaser was one Fred Eberhard, and that he was financially responsible and possessed money and credit sufficient to enable him to purchase said property and pay defendant the purchase price thereof. That on Oct. 15, 1918, a contract was entered into between the said Fred Eberhard and the defendant for the purchase of said ranch, sheep and certain personal property on said ranch, by the terms of which Eberhard was to pay $35,000 for the ranch, $17.00 per head for the sheep and $5,500 for the other personal property, $10,000 to be paid, and was paid, at the signing of the agreement, and the balance to be paid and possession to be given on or before Dec. 1, 1918. That at the time of entering into the contract of sale the defendant had no knowledge of the financial responsibility of Eberhard other than the representations of plaintiff and that it relied upon the information furnished by plaintiff in that

respect. That said statements of plaintiff respecting Eberhard's financial responsibility were false and untrue and he was not financially responsible, was not able and did not comply with the contract and pay the balance of the purchase money or take the property. That defendant complied in every respect with its contract and was able and willing to convey and deliver the said property as required by the contract on the payment of the purchase price. That by reason of the failure of Eberhard to complete the purchase by payment of the balance of the purchase price plaintiff failed to earn or be entitled to any commission. Then follows a general denial of the second cause of action.

The plaintiff filed a reply which reiterated the claims of the petition and denied that he made any false and untrue statements concerning the financial responsibility and worth of Eberhard and denied that Eberhard was not financially able to comply with the contract of purchase at the time he entered into said contract with the defendant; alleges that defendant had ample time and opportunity to ascertain Eberhard's financial responsibility and worth before entering into the contract with him and defendant accepted him as the purchaser found by plaintiff without any question as to his financial responsibility and entered into the contract at which time plaintiff's commission became due and payable to plaintiff from defendant and plaintiff was estopped from claiming there is nothing due plaintiff by reason of the failure of Eberhard to complete the purchase by payment of the balance of the purchase price.

The petition in error sets out seven different specifications of error; to-wit:

"1. That said court erred in ruling out the evidence offered by the said W. W. Murphy on the trial of said action."

"2. That said court erred in over-ruling the motion of said W. W. Murphy for a directed verdict, at the close of the trial, under his first cause of action in the amended petition."

"3.   That said court erred in the instructions given to the jury on the trial of said action, viz: Instructions Nos. 2 and 3, as appears in the record."

"4.   That said court erred in refusing to give the instructions which plaintiff in error prayed the court to give, viz:   Instructions 'A' to 'L', inclusive, as appears in the record."

"5.   That said court erred in over-ruling the motion of plaintiff for a new trial."

"6.   That judgment was given for said defendant, when it ought to have been given for the said plaintiff, according to the laws of the land."

"7.   And there are other errors, prejudicial to the plaintiff in error, manifest upon the face of the record."

The motion for a new trial contained five different grounds as follows:

"1st.   The verdict is not sustained by sufficient evidence and is contrary to law."

"2nd.   The court erred in its instructions to the jury each and every one of which was excepted to, at the time, by the plaintiff."

"3rd.   The court erred in refusing the instructions asked by the plaintiff, to which refusal the plaintiff, at the time, excepted."

"4th.   For the several errors of law occurring at the trial, and to the commission of each and every of which the plaintiff, at the time, excepted."

"5th.   And for other manifest errors apparent upon the face of the record."

It is evident that the first and second grounds of error mentioned in the petition in error not being specifically mentioned in the motion for a new trial are waived and cannot be considered here, and while the motion for a new trial alleges error in the giving of all the instructions given to the jury the petition in error claims error only in the giving of instructions 2 and 3, and the record shows that these two were the only ones excepted to by plaintiff, which we will later consider.

The principal contention of the plaintiff is that when a broker has produced a purchaser for 'the property in question who is able, ready and willing to purchase at the price named and an enforceable contract is entered into between the owner and the purchaser found by the broker that the broker's commissions become at once due and payable, notwithstanding the fact that the contract of sale is never carried out by the final payment of the purchase money. This is the law governing ordinary brokerage contracts such as is pleaded by plaintiff herein, and was so held by this court in the case of Frost v. Houx, et al., 15 Wyo. 353, 89 Pac. 568. It may well be admitted that had plaintiff proved the contract plead in his petition he should have obtained the verdict and judgment, but it devolved upon plaintiff to sustain the contract plead by him by a preponderance of the evidence and the court so instructed the jury.

Whatever agreement or understanding that was had between these parties relative to the sale of the ranch and sheep was oral and consisted of conversations had over the long distance telephone and not heard by anyone else as far as disclosed by the record other than C. C. Worland, secretary and treasurer of the defendant corporation, and W. W. Murphy, the plaintiff, who were the parties to the conversation. Each of these parties testified as to their recollection of what was said as follows:

The plaintiff testified:

"Q.   Now, Mr. Murphy, you may state if on or about the 23rd day of September, 1918, you had a conversation with any of the officers of the defendant in reference to selling some ranch lands and stock?

A.   I did.

Q.   And with whom did you have that conversation?

A.   C. C. Worland.

Q.   And that is the gentleman right here (indicating) C. C. Worland?

A.   Yes, sir.

Q. Now, did you at any time have an agreement with the defendant to sell their ranch lands and some stock for them, if any? (Objection.)

Q. Did you have an agreement at any time. with the defendant prior—shortly prior to October 15th, 1918, whereby you was to sell the ranch lands and certain sheep for the defendant?

A. I did.

Q. Now, you tell the jury what that agreement was. (Objection.)

*By the Court:* Yes, he may state what was said between the two parties.

Q. You may state what that agreement was by stating what was said between you and Mr. Worland and when it was.

A. I called Mr. Worland over the phone and talked with him previous to this time about selling his ranch property and sheep and. on this day I called him up and asked him if he still wanted to sell them. He said he did. I asked him the price of the ranch property—first, I asked him what it consisted of. He said about—around 6,000 acres of deeded lands and about 2,000 acres of leased lands—

Q. About how many acres of deeded land?

A. Around 2,000 acres of deeded land—of leased land, I should say.

Q. 6,000——

A. 600 of deeded land and about 2,000 of leased land. I asked him the price of the property. He told me $30,000, and then I asked him how many sheep he had and I don't just remember, but I think he said around 5,500, and I asked him the price of the sheep. He said $17.00 a head, and I asked him then if he would pay a commission out of the $30,000. He said, 'No.' I said, 'Well, I have a man, one Mr. Eberhard, here with me that will pay $35,000 for the ranch property and will take some sheep', and I said to him, I said, 'How will that be, to put the ranch property at $35,000 and you pay us $5,000, and whatever is right for

the sheep?' He said, 'Alright, it was alright, bring him over.'

Q.  Was this conversation held over the phone?

A.  Yes, sir.

Q.  And where was you when you was talking to Mr. Worland?

A.  . I was at the Irma Hotel.

Q.  Irma Hotel in Cody?

A.  Yes, sir.

Q.  And where was he?

A.  He was at Worland."

On cross-examination:

"Q.  Now, when you talked to him here you asked him if he wanted to sell the ranch and sheep?

A.  Yes, sir.

Q.  And he said he did?

A.  Yes, sir.

Q.  You asked him what his price was for the ranch?

A.  Yes, sir.

Q.  And he said $30,000?

A.  Yes, sir.

Q.  You asked him what his price was for the sheep and he told you $17?

A.  Yes, sir.

Q.  Did he tell on that conversation how many sheep he had?

A.  I think he said around 5,500.

Q.  And you think he said that at that conversation?

A.  Yes, sir.

Q.  On the 23rd of September. Now, you asked him what commission he would pay and he told you he wouldn't pay any, didn't he?

A.  Yes, sir.

Q.  You suggested to him, didn't you, that you could— had a purchaser that would give $35,000 for the ranch, or that you could price the ranch at $35,000?

A.  Yes, sir.

Q.   And that you would be willing to take the $5,000 as commission?

A.   No, sir.

Q.   You didn't say that?

A.   No, sir.

Q.   What did you say to do with the $5,000?

A.   As I stated before, I told him price the ranch at $35,000, he to pay us $5,000 and what was right for the sheep.

Q.·  Well, now, did he tell you before that that he wouldn't sell the ranch unless he sold the sheep?

A.   He said he wanted to sell the whole outfit."

C. C. Worland testified in regard thereto:

"Q.   Now, in September, where were you when you had the first talk?

A.   We were shipping sheep at Arminto and Mr. Murphy called me up there.

Q.   Called you up on the phone?

A.   Yes, sir.

Q.   And did you hear what he said?

A.   Yes sir.

Q.   And were you able to communicate with him?

A.   I was.

Q.   Now, can you tell the jury just what he said to you and what you said to him at that time with respect to the sale of the ranch or the sheep?

A.   Well, Mr. Murphy called me up and said he heard that we were offering the Big Trails ranch and the sheep for sale and I told him we was, and he said he had a buyer and he wanted to know what we wanted for the ranch and sheep and I told him we wanted $30,000 for the ranch and $17.00 a head for the sheep and he said, 'How about commissions?' Well, I said, 'That is the price that we have got to have; that is the lowest possible price we can take for this stuff.' Well, he said—I said, 'You will have to figure out the commission some other way.' He said, 'How about me putting a price of $35,000 on the ranch and after getting $30,000 for you for the ranch, the $5,000 will be my com-

mission' and I said that would be agreeable with me, so that was about the size of the—that was about the conversation at that time.

"Q.   When you had the original talk with him at Arminto, was that the time you told him he could have as commission on the deal all he got for the ranch over $30,000?

A.   That is the only conversation I ever had with him regarding commissions.

Q.   And did he ask you what commission you would give him for selling the sheep at $17.00 and the ranch at $30,000 in the first place?

A.   Well, preliminary to the $5,000 proposition, he said, 'Our usual commission is 5 per cent and 25 cents a head for the sheep,' but in the conversation afterwards it developed that if he could get $35,000 for the ranch he would take $5,000 for his commission.

Q.   I thought I understood you to say that you told him that $30,000 for the ranch and $17.00 for the sheep must be net to you?   (Objection.)

A.   Yes, that is what I told him, that is the price we had to have net.

Q:   And you told him that after he had suggested to you that the ordinary price was 5 per cent commission and 25 cents a head for selling sheep?

A.   That was during the conversation he stated the usual commissions was that.

Q.   It was all during the same conversation?

A.   Yes, but the $5,000 commission I understood to be the final—that was after the other talk.

Q.   When was this commission to be paid?

A.   When we had received $30,000."

And on cross-examination as follows:

"Q.   Which one of the conversations was it where the agreement as to the commissions were settled between you and Mr. Murphy?

A.   That is the conversation when I was at Arminto.

Q.   And where was Mr. Murphy?

A.  Well, I don't know where he was at.  I don't think I asked him over the phone.  I thought he was at Basin, but I didn't ask him at the time.

Q.  I will ask you if you didn't have a conversation between you and Mr. Murphy when he was at Basin and you was at Arminto on the 16th day of September, 1918?

A.  It was some time in September.  I don't know the date.

Q.  And I will ask you afterwards if there wasn't another conversation between you and Mr. Murphy respecting the commission when he was at Cody and you was at Worland on September 23rd, 1918?

A.  We only had one conversation where the commission entered and that was when I was at Arminto, a phone conversation."

It will be seen from the above quotations that although in some things there was little conflict in the evidence in regard to the main question what was the agreement as to commissions there was a wide misunderstanding between the parties.  The jury accepted defendant's version as to this, and as the defendant did not receive the $30,000 or $17.00 per head for the sheep it was relieved of any obligation to pay plaintiff any commission.  This was a matter peculiarly within the province of the jury, and we, under the well known and often stated rule "that an appellate court should not reverse a verdict rendered when the evidence is conflicting" have no right to disturb the verdict.  Further, we think the jury acted rightly under the evidence, the plaintiff failed to prove the contract plead by a preponderance of the evidence and in addition several significant facts appear in the record which tend to show that the plaintiff did not think he was entitled to be paid his commissions until the defendant had received all the purchase price.  At the time the written contract between Eberhard and the defendant was executed at the ranch the plaintiff was present and witnessed the contract and had in his possession the $10,000 for the cash payment and after the signing he took possession of the contract and kept the check and brought

both to Worland and delivered them to Ira Jones, assistant secretary and bookkeeper of the defendant company; but although, if his allegations and contentions are correct, his commissions were then due and payable from the defendant, he delivered the check without any demand or intimation that he should be paid; and having occasion to write Ira Jones on Oct. 28, more than a month before the time for the final payment as fixed by the contract of sale, in regard to the numbers of the land and water rights and abstract of title to complete a loan he was endeavoring to secure for Eberhard so he could complete the payment of the purchase price, he requested that Jones urge Eberhard to speedily make full payment so he could receive his money, as contained in the following excerpt from that letter:

"When Mr. Eberhard left here for the ranch last Wednesday everything was O. K. and he expected to pay more on this deal in a week or so or just as soon as he could get things straightened out at the ranch and get back down to Worland, so, I think it well that he cleans the most of this up at the next payment, as he can just as well as not, and I need some money soon as well as Mr. Worland will want the most of this settled soon, so, urge Mr. Eberhard if he comes in to make payments as he stated to pay all he can now and then finish up in a short time."

As to the second cause of action, from all the evidence in regard thereto it does not appear that it was ever agreed or contemplated that any commission was to be paid if the sheep were sold for $17.00 per head, except as the extra $5,000, if paid for the lands over defendant's price, might be intended to include commissions on the sale of the sheep and when plaintiff made demand on defendant by sending an order to Worland on the day before the final payment was due by Eberhard according to the terms of the written contract, it is significant that the order was for $5,000 only and did not include the amount claimed in the second cause of action as commission on the sheep.

We have carefully examined the instructions given by the court and those asked for by plaintiff and refused by the

trial court, and do not think any reversible error was com-
mitted. The jury seems to have been fully instructed as to
all questions of law necessary under the pleadings and evi-
dence in the case. All of the principles contained in the re-
quests that were refused that were applicable to the case
as made were embodied in other instructions given by the
court in different form. The instruction given that is most
earnestly objected to reads as follows:          .

"You are further instructed that it is the duty of the
jury in this case to first determine under the evidence what
the contract for commission, if any, was as between the
plaintiff and defendant herein. If you find that the agree-
ment entered into between the plaintiff and defendant was
that the defendant instructed the plaintiff that he would
sell his ranch property for $30,000 net and refused to pay
any commission but instructed the plaintiff that he must
get his commission from some other source, then I instruct
you that the plaintiff would not be a broker under the or-
dinary term but that he would be acting under a special
contract, and would not be entitled to and could not col-
lect his commission claimed under his first cause of action
until the defendant had been paid the $30,000 in full for his
property; but if you find that the plaintiff and defendant
entered into an agreement whereby the defendant agreed
to pay the plaintiff $5,000 if he found a purchaser for the
ranch lands at $35,000 and that there was no agreement as
to the net amount due the defendant and no agreement as to
the plaintiff receiving his commission other than from the
defendant, then I charge you that the law as hereinafter
defined pertaining to brokers applies."

The case of Hopkins v. Settles (Okla.), 149 Pac. 890, is
one in most respects like the case at bar. In that case a
similar instruction was objected to and the Supreme Court
of Oklahoma said, in regard thereto:

"In the light of the contentions of the parties and the
evidence introduced in relation thereto, this instruction was
substantially correct; in fact, while many instructions were
given, fairly covering plaintiff's theory of the case, this is

the one special instruction that submitted to the jury the defendant's theory. If defendant's theory was correct, he was under no obligation to pay plaintiff the amount claimed, and this instruction merely tells the jury so."

We may well adopt this language as our own in this case, although this instruction also contains plaintiff's theory as well as defendant's, which the instruction in the Oklahoma case did not. Finding no reversible error in the record, the judgment of the lower court will be affirmed.

*Affirmed.*

BEARD, C. J., and POTTER, J., concur.


ON PETITION FOR REHEARING

POTTER, JUSTICE.

In this action to recover money alleged to be due as a broker's commission, the judgment of the District Court in favor of the defendant, upon the verdict of a jury, was affirmed, and the case is again before us upon a petition for rehearing filed by the plaintiff in error, who was also plaintiff below.

The plaintiff's right to recover was shown to depend primarily upon the effect of a conversation by telephone between him and C. C. Worland, the secretary and treasurer of the defendant company, as constituting the only agreement between the parties for the services and compensation of the plaintiff, in connection with the sale of the property in question. Each of said parties to that conversation testified concerning it, and their testimony in that respect is set out in the former opinion. (See 187 Pac. 189-190.) They do not exactly agree in their testimony as to what was said with reference to the payment of a commission, but they do agree that the said Worland stated that the company's price for the property—ranch property and sheep— was $30,000 for the ranch property and $17 per head for the sheep, and that they would not pay any commission out of the $30,000. And Worland testified that he told the plaintiff they would not pay any commission out of the stated price for either the ranch or the sheep. The con-

flict in their testimony relates to what was said immediately after that as a part of the same conversation.

The plaintiff testified that he then told Worland that he had a man with him, one Eberhard, who would pay $35,000 for the ranch property and would take some sheep, and asked him how it would be to put the ranch property at $35,000 and "you pay us $5,000 and whatever is right for the sheep", and that Worland said: "All right; it was all right; bring him over." Worland's version of that part of the conversation, given in his testimony, was, that the plaintiff said: "How about me putting a price of $35,000 on the ranch, and, after getting $30,000 for you for the ranch, the $5,000 will be my commission," and that he, Worland, replied by saying that that would be agreeable with him. And he further testified that he told the plaintiff in said conversation that the $30,000 for the ranch, and $17 for the sheep must be net,—"that is what I told him; that is the price we had to have net."

The prospective purchaser named in the conversation and Worland, representing the defendant, having been brought together by the plaintiff, and a contract entered into by them for the sale of the ranch property and some sheep, the plaintiff claimed to be entitled to a commission of $5,000 for the sale of the ranch property and a reasonable amount for the sale of the sheep, basing the claim upon the principles applicable to ordinary brokerage contracts, notwithstanding that, without the defendant's fault, the sale was not completed and the only amount paid upon the agreed price was the advance cash payment of $10,000 at the time of making the contract. And the same point is again urged in support of the petition for rehearing, that is to say, that the plaintiff became entitled to his broker's commission when the purchaser found by him and the owner entered into an enforceable contract for the sale of the property at the price named. That was conceded, in the former opinion, to be the law governing an ordinary brokerage contract such as pleaded by the plaintiff in this case.

But the difficulty with the proposition in this case is that the defendant, by its answer, denied the contract pleaded in the petition and alleged a different contract for the commission—a special contract—as shown in the former opinion by stating the substance of the averments of the answer to the first cause of action, to the effect: That plaintiff was advised by defendant that the latter was willing to sell the ranch property for $30,000, the sheep for $17 per head, and certain other personal property for $5,500, but would not pay any commission for a sale at those prices, and that any commission for plaintiff upon a sale to a purchaser procured by him at those prices would have to be obtained by him entirely from the purchaser; and that plaintiff having then represented that he had a purchaser who would pay $35,000 for the ranch and $17 per head for the sheep, and $5,500 for the other property, it was agreed that if the plaintiff would procure a purchaser for said property who would purchase and pay for the same at the prices last named, "defendant would pay plaintiff the sum of $5,000, being the difference between the price for which defendant was willing to sell and the price which plaintiff represented the purchaser to be procured by him would pay therefor." And defendant's evidence introduced to show what the contract was not only contradicts the plaintiff's evidence to prove the contract alleged by him, in some material respects, but it supports the averments of the answer as to the agreement or understanding concerning the payment of a commission. And the jury, by returning a verdict for the defendant, must have found in view of the instructions of the court, that the agreement or understanding was as stated in the testimony of Mr. Worland.

The general rule of brokerage contracts that the broker is entitled to his commission when a purchaser procured by him and the employer have entered into a valid, binding, and enforceable contract of sale, whether the contract is afterwards carried into effect and the sale actually consummated or not, cannot, of course, govern where there is a provision to the contrary in the contract of employment. It is a rule

of evidence, and does not mean that in all cases a broker must show that his efforts have resulted in a valid and en-forfeable contract of sale to entitle him to his commission. But the fact that such a contract has been entered into is held to be presumptive evidence of the performance of the broker's ordinary duty to produce a purchaser ready, willing, and able to buy at the price, and upon the terms, if any, proposed, or an acceptance of the purchaser by the owner waiving the latter's right to object on the ground that the purchaser was not able to complete the purchase or pay the agreed purchase price (2 Mecham on Agency, 2nd Ed., Secs. 2440, 2441). The rule is, therefore, without controlling application when the commission is made dependent upon other conditions than the mere finding of a customer ready, able and willing to buy, at least where the failure of such conditions is not the fault of the owner or the result of a situation for which he is responsible.

And the principle is as well settled as the general rule aforesaid that where, by the contract of employment, the commission is made dependent upon certain conditions or contingencies, as upon the actual consummation of a sale, or the full payment of the purchase money, or a specified part thereof, such as an agreed first payment, or a net price to the owner, these stipulations will govern, and a fulfillment or performance of the prescribed conditions is generally essential to the right to compensation (2 Mecham on Agency, 2nd Ed., Sec. 2427; 4 R. C. L. 310, 312; 9 C. J. 581, 587, 632; 23 Ency. L., 2nd Ed., 911, 918, 919, 923; Lindley v. Fay, 119 Cal. 239, 51 Pac. 333; Robertson v. Vasey, 125 Ia. 526; Cremer v. Miller, 56 Minn. 52; Van Norman v. Fitchette, 100 Minn. 145, 110 N. W. 851; Antisdel v. Canfield, 119 Mich. 229, 77 N. W. 944; Columbia Realty Co. v. Alameda Land Co. (Ore.), 168 Pac. 64; Orr v. Schwager & Nettleton, 74 Wash. 631, 134 Pac. 501; Lyle v. Univ. L. & Inv. Co. (Tex. Civ. App.), 30 S. W. 723; Burnett v. Edling, 19 Tex. Civ. App. 711; Larson v. Burroughs, 131 App. Div. N. Y. 877; Pratt v. Irwin, Mo. App. 189 S. W. 398; Murray v. Rickard, 103 Va. 132; Cies v.

Gale, 168 Mo. App. 282; Laird v. Schmidt, 80 O. St. 108, and see note to Moore v. Irwin, 20 L. R. A. (N. S.) 1172-1174).

Thus, after stating the contention of plaintiff in Columbia Realty Co. v. Alameda Land Co., *supra,* that when it produced a purchaser with whom defendant made a binding contract of sale, it earned its commission and that its right thereto was not lost by the default of the purchaser or the cancellation of the contract, the court said, "This is the general rule (Stewart v. Will, 65 Ore. 138, 140, 141, 131 Pac. 1027). But it is subject to modification by the parties. The material question here is whether the contract on which plaintiff relies contains a promise to pay commission at all events or only out of a specified fund, to-wit, the amounts paid by the purchasers." And in Lindley v. Fay, *supra,* the court said that the evidence "tends to show an agreement to pay commissions out of the first money received, and no money has ever been received. Under such a contract, the broker is not entitled to compensation when he finds a purchaser ready, willing, and able to purchase on the prescribed terms. There must be a sale and a first payment to entitle him to recover. It is so nominated in the bond." So in Pratt v. Irwin, *supra,* the court said respecting the general rule aforesaid as to the effect of a written binding contract and the refusal of the purchaser to perform the same: "But that rule does not forbid the parties from stipulating that the commission shall not accrue until the sale or exchange be consummated. The conversation between the parties in which they agreed upon the amount of the commission, as detailed by defendant, shows that both parties understood the contract of employment, which was oral, to mean that plaintiff would not be entitled to his commission until the exchange of farms was actually made."

In Van Norman v. Fitchette, *supra,* the court said: "This is not the ordinary contract by which the broker agrees to furnish a purchaser ready, willing, and able to buy the property upon stated terms. * * * Here the parties entered into a different kind of a contract, expressly providing that

the $2,500 commission should not be earned or paid until the $12,500 should be actually paid on May 30, and the mortgage for $10,000 executed and delivered.  *  *  * The commission was not earned until the company (the purchaser) performed what it agreed to do."  And it was said by the court in Antisdel v. Canfield, *supra*, where there was an actual and completed sale, but for less than a stated net price: "One of the conditions of the alleged agreement *  *  * was that he (the broker) should make a sale which should net Mr. Canfield (the owner) $1,200,000.  This he did not do.  *  *  * The judge should have directed a verdict in favor of the defendant."  In the opinion disposing of Karr v. Moffett, 187 Pac. 683, on petition for rehearing, the Supreme Court of Kansas said: "Appellee sued for an ordinary real estate dealer's commission, alleging that he had earned it in the usual way.  *  *  * The proof of existence of the special contract was surely an effective way of disproving that the defendants owed the plaintiff for services under an ordinary real estate dealer's contract, such as would entitle the agent to the usual commission when he had brought buyer and seller together, whereby they consummated a sale on terms agreeable to each other 'when he had been the procuring cause of the sale', as the stock phrase in such cases is expressed."

The testimony of defendant's witness as to the words of the conversation about the commission, which we think must be regarded as having been accepted by the jury, seems clearly to show that defendant was to receive or be paid the sum of $30,000 for the ranch property before the right to any commission would accrue, or, in other words, the right to the commission was contingent upon defendant's receiving said sum net, and the commission was to consist of the amount received or paid in excess of that sum, or the difference between it and $35,000, the amount to be named as the sale price for the purpose of providing an excess over the required net price for plaintiff's commission.  As said witness states, after he had informed the plaintiff that no commission would be paid out of his stated price for either ranch

or sheep, plaintiff's proposal was that he should name $35,-000 as the price for the ranch, and "after getting $30,000 for you for the ranch, the $5,000 will be my commission", and that is to be understood as intending and meaning, we think, that the extra $5,000, that particular part of the total price to be named, was to constitute the commission. . This, clearly, in our opinion, amounted to a special contract, taking the case out of the general rule aforesaid, and requiring a completion of the sale by the actual payment or securing of the purchase price to entitle the plaintiff to a commission. There were to be no deferred payments after the consummation of the sale. It was to be a cash transaction. The contract was dated October 1·5, 1918, at which time the cash payment of $10,000 was made, as recited in the contract, and the balance was required to be paid on or before 30 days from the date thereof, or as soon as abstracts of title should be completed, and the contract provided for the transfer of possession to the purchaser on December 1, 1918.

Where the broker's contract of employment, as in this case, provides for a net price to the owner, or for a commission out of or to consist of the excess above a stated selling price, such contract is generally construed as requiring, as a condition to the right to the agreed commission, an actual or completed sale for an amount exceeding such net or selling price, unless the same has been prevented by the fault of the owner (Beale v. Bond, 84 L. T. Rep. 313; Fletcher v. Campbell, 29 Ont. L. Rep. 501; Gilmore v. Bolio, 165 Mich. 633, 131 N. W. 105, 35 L. R. A. (N. S.) 1050; Beatty v. Russell, 41 Neb. 321; Emery v. Atlanta Real Est. Exch. (Ga.), 14 S. E. 556; Wolverton v. Tuttle, 51 Ore. 501, 94 Pac. 961; Munroe v. Taylor, 191 Mass. 483; Mc-Carty v. Bristow (Tex. Civ. App.), 145 S. W. 1029; Orr v. Schwager & Nettleton, 74 Wash. 631, 134 Pac. 501; Seabury v. Fidelity Ins., etc., Co., 205 Pa. St. 234; Burnett v. Potts, 236 Ill. 499; Nudelman v. Wildes, 160 Ill. App. 134; Hopkins v. Settles (Okla.), 149 Pac. 890; Cies v. Gale, 168 Mo. App. 282; Seattle Land Co. v. Day, 2 Wash. St., 27 Pac. 74; Ford v. Brown, 120 Cal. 551, 52 Pac. 817;

Atwood v. Gugel, 166 Wis. 430; Larson v. Burroughs, 131 App. Div. N. Y. 877).

This is well illustrated in the Pennsylvania case of Seabury v. Fidelity·etc. Co., *supra*. The agreement for the commission in that case was in the form of a written promise of the owner to pay, "in the event of a sale of the property" a commission of one per cent on the amount of $1,400,000, and, "in addition to the above * * * all the amount in excess of one million, four hundred thousand dollars". The broker procured a purchaser who entered into a contract to buy at $1,500,000, but who, after extensions of time for payments under the contract, was unable to complete the required payments, but was negotiating with the owner about the matter when the owner died, and his executors refused to carry out the contract. Suit was brought for the one per cent on the stated selling price of $1,400,000, and for the excess of $100,000 over that sum which the purchaser had agreed to pay. Recovery was allowed for the one per cent on the owner's fixed selling price, but denied for the excess over that price, the court saying: "In the first place, we think it clear that the rights of Seabury (the broker) rest solely on his contract with Moore; he does not sue on a *quantum meruit;* his statement is based on that contract; no reasonable interpretation can be given it other than that he was only to receive the excess over $1,400,000 in the event of a sale being actually consummated. It was not consummated, no matter from what cause."

In the Illinois case above cited, of Burnett v. Potts, the case was thus stated: Appellees were the owners of land which they authorized appellant to sell for $35,000 net cash to appellees, appellant to have as compensation all that he could sell the land for over that sum. Appellant made a contract of sale with one Bowman for $37,500, $1,000 of which was paid to him at the time of executing the contract, the balance to be paid at different times between the date of the contract and the first of March following. The appellees furnished an abstract showing a merchantable title and executed a deed and deposited it in escrow with a bank

to be delivered to the purchaser when the $35,000 was paid to the bank for the appellees. Bowman made default and never paid anything except the $1,000. Suit was brought by the appellees against appellant for the $1,000 held by him, which he claimed as commission. The court said:

"The money sued for was paid to appellant in his capacity as agent for the owner. The money at no time belonged to the appellant, as between him and his principals. Appellant was not entitled to any compensation for making this sale until appellees received the $35,000, unless their failure to so receive it was the result of their own fault. That it was not the fault of appellees is determined against the appellant by the affirmance of this judgment by the appellate court.  *  *  *  Such contracts differ from the usual agency contract where the compensation is a per cent of the price at which the sale is made, only in that the compensation is contingent upon the agent's obtaining more for the land than the owner has agreed to accept. If appellant had sold this land for $35,000 he would have been compelled to turn the entire proceeds over to his principals. We do not see upon what legal grounds he can retain any part of the purchase money when only $1,000 has been paid."

In the English case, Beale v. Bond, *supra,* the owner gave a so-called commission note to the broker reading as follows: "I agree to accept the sum of 1,150 pounds for the above property, and you are to be at liberty to receive anything over and above that as a commission, it being understood that I am to receive the full sum of 1,150 pounds without deduction, except, of course, apportionments of outgoings. Completion to be within a month, and a deposit of 10 per cent to be paid down." The broker made a contract in behalf of his principal for the sum of 1,250 pounds and was paid 25 pounds as a deposit. Owing to the purchaser's default, the sale was not completed, and the owner brought suit to recover the deposit from the broker. The court said:

"This is a very special contract, by which the plaintiff made a special bargain with the defendant and not a bar-

gain to pay commission in the ordinary way. The plaintiff did not intend to pay anything; the defendant was not to be paid by the plaintiff at all, but was to take any difference above 1,150 pounds which might be actually received by the plaintiff."

In the syllabus to the Ontario case of Fletcher v. Campbell, *supra*, the decision is thus stated: "Where the only agreement for payment of an agent's commission on a sale of land for his principal contains the term that it is to be paid out of the purchase money, the agent cannot recover if the sale falls through without the fault of his employer, and the only money the employer or agent receives on the purchase is the deposit, which falls to be forfeited."

In the case cited from Massachusetts, Munroe v. Taylor, it appeared that there was an agreement placing the property in the agent's hands for sale as follows: "The price asked by Ann E. Taylor is $10,000. All over that amount that it is sold for F. B. Munroe has as his commission for selling the property." A second agreement was made authorizing a sale "for the sum of $10,330, and F. B. Munroe is to have for himself as commission all over that amount he can get for it." A binding contract to purchase at a price largely in advance of the amount so fixed was entered into as a result of the agent's negotiations, but for reasons said to be not disclosed the sale was never consummated. The suit was to recover the broker's commission. A verdict was directed for defendant, and on exceptions before the appellate court it was said, in disposing of and over-ruling the same:

"The case turns upon the construction to be given to the contract. By the language used it is manifest that the price at which the property sold was to fix the amount of plaintiff's commission. It was contemplated that an actual sale should be effected, and that payments to him should be made from the price obtained, and it was not an undertaking whereby the broker is only to find a purchaser, and having done so it becomes wholly immaterial so far as earning his commission is concerned whether the principal accepts the

bargain, or lets the opportunity lapse. * * * But here the written agreements out of which the plaintiff's right of action arises, either considered separately or together, must be construed as meaning that the sale was to be completed, and then out of the price any surplus beyond the amount stipulated which the defendant was to receive shall be paid to him for his services. What the plaintiff really undertook was not only to find a purchaser at a fixed price, but to effect a sale, which meant a payment of the price, and this having been done he would have earned the excess, but until the consideration became payable, or the defendant refused to convey, he could not demand any remuneration, or maintain an action for breach of the contract."

The facts of the California case of Ford v. Brown, briefly stated, were: That the owner gave the brokers written authority to sell her real estate for $15,500, "or any less sum hereafter fixed by me in writing," and thereby agreed "to pay them $500 of purchase price when property is sold or a purchaser found." A little more than a year later the brokers found a purchaser at the price of $15,250, and made a contract of sale with him for that sum. Thereupon the owner gave the brokers a writing stating: "I hereby ratify sale of my lot this day made by G. H. Umbson & Company, for the sum of $14,800 net to me." It did not appear that the sale was ever consummated. The brokers brought suit for $450 commission. The court said that the sale was not made under the old contract, but under the new one whereby the brokers were authorized to sell at any price so that they gave the owner $14,800 net. "She did not agree to pay them anything for their services. On the contrary, the brokers were, in effect, told that she would not pay them, but they must get their pay from the purchaser. * * * Under the contract last made it would follow that the brokers were entitled to no compensation, unless the sale was perfected, and purchase money exceeding $14,800 was received."

The offer of the owner in the Georgia Case of Emery v. Atlanta R. E. Exch., *supra,* was to sell for $11,250 net.

The broker accepted it, "upon condition that sale is perfected", a condition which the court said was probably inserted for the protection of the broker against any obligation on their part to buy the land, but which operated also in favor of the seller. The court further said, that the sale for $11,250 net was to be for cash, in the absence of contrary specifications, and that the conclusion of a binding contract for the sale would not fulfill the broker's obligation, but the sale itself must be perfected within the time limited.

In Wolverton v. Tuttle, *supra,* the Supreme Court of Washington say that "the use of the expression 'net' to the vendor necessarily precludes any inference that Tuttle was to pay a commission in the event of a sale, unless the sum received should exceed the specified 'net' price. It can only be inferred that plaintiffs were either to look to this excess, if any, or to the purchasers for their compensation."

Plaintiff strongly relies upon Yoder v. Randol, 16 Okla. 308, 83 Pac. 537, as sustaining his contention that upon the facts in the case his commission was earned when the contract of sale was entered into. That case, with respect to the point here involved, was decided upon the pleadings, the trial court having rendered judgment upon the pleadings, and the Supreme Court held that the answer not only failed to rebut the averment in the petition of the employment and of a compliance with the terms thereof, but recognized the procurement of a purchaser by plaintiff, and acceptance of such purchaser by defendant, and it is stated in the opinion in the case that the petition alleged that the contract was to pay plaintiff a commission to consist of the excess above the net price to defendant of $2,750, that a purchaser was procured for $3,000, that defendant entered into a written contract of sale with said purchaser, *"and has since then duly conveyed said land to said purchaser."* A very different situation from that disclosed by the pleadings and evidence in the case at bar. The later Oklahoma case of Hopkins v. Settles, *supra,* which was cited and quoted from in our former opinion, shows the opinion of the Supreme Court of that state with reference to the right to recover a

commission upon facts quite similar to those in this case, and, in effect, substantially the same. And, in that case the right to recover was denied.

The point is made in the petition for rehearing and brief that there was a variance between defendant's proof and the allegations of the answer. And it is argued in support thereof that the answer admits the contract of employment alleged in the petition, and fails to allege a special contract. We think it very clear that the answer does not admit the contract between the parties as alleged in the petition, but does allege a special contract. It first denies, generally, each and every allegation of the petition not specifically admitted, and then alleges that defendant advised plaintiff it was willing to sell at the prices of $30,000 for the ranch and $17 per head for the sheep, but would not pay any commission at those prices, and that upon plaintiff then representing that he had a purchaser who would pay $35,000 for the ranch and $17 per head for the sheep, defendant agreed that, if plaintiff produced a purchaser who would *purchase* and *pay* for the property at the prices named, then the defendant would pay plaintiff the sum of $5,000, *"the difference between the price for which plaintiff was willing to sell and the price plaintiff represented the purchaser produced by him would pay therefor."* By that averment plaintiff was to receive or be paid the sum named out of the purchase money when paid, and it was to be the excess above the net price to the owner of $30,000.

It seems to be also contended that by the execution of the contract of sale the defendant *actually received* the purchase money. Of course, no authority so holds, and it is perfectly obvious that no part of the purchase price, except the sum of $10,000, was received by the defendant. The balance was surely not paid, nor secured by the purchaser, and could not, therefore, have been received.

The petition for rehearing must be denied.

*Rehearing denied.*

BEARD, C. J., and BLYDENBURGH, J., concur.