[Civ. No. 6192. First Appellate District, Division One.—May 31, 1928.]

JAMES H. ALLEN, Respondent, v. ANNA S. DAILEY, as Special Administratrix, etc., Appellant.

Haas & Dunnigan, R. A. Dunnigan and H. L. Dunnigan for Appellant.

George P. Adams, Turnbull, Heffron and Kelly and Samuel H. French for Respondent.

KNIGHT, J.—Plaintiff brought this suit to obtain and was granted a decree requiring specific performance of an alleged contract for the sale of real property situate on Western Avenue, Los Angeles, from which decree defendant appeals.

The suit was instituted against James S. Dailey, the owner of the property, who was a resident of Chicago, but his death occurred prior to trial and thereupon his wife, having been appointed special administratrix, was substituted as party defendant. Plaintiff was a licensed realtor residing in Los Angeles, and maintained an office near the property in question. The negotiations for the sale of the property were carried on by means of telegrams and letters, and the trial court found therefrom that on or about February 17, 1923, Dailey agreed in writing to sell and Allen agreed to buy said property for the sum of $40,000 net to Dailey, and further found in effect, contrary to the claim of appellant, that said correspondence did not create an agency between the parties mentioned out of which fiduciary relations arose precluding Allen from purchasing the property· on his account or as the agent of others. Appellant assails the foregoing findings upon the ground that the same are not supported by the evidence. The first question presented, therefore, relates to the legal construction which shall be placed upon said telegrams and letters.

The series of correspondence began on January 8, 1923, when Allen telegraphed Dailey at Chicago as follows: "Have customer for your lot North Western Avenue near Santa Monica Blvd. All cash. What will you take for it net, I must know by wire party is looking at other prop-

erty. Answer my expense, 5502 Santa Monica Blvd.'' Dailey replied by wire that the price was $40,000. Within a week thereafter Allen wrote Dailey, acknowledging receipt of the latter's telegram and stated: "We have a party who is figuring on this lot, and as you know deals of this kind take time to round up as they move slowly, we would like to have you give us an exclusive sale right on this lot for sixty days which will give us time to close our party up on this. We have priced the lot at $42,000 and are hoping to turn it at that figure within the sixty days." Under date of January 18, 1923, Dailey replied as follows: "Your letter received with reference to giving option on my property for sixty (60) days. I have never done this and do not care to do it now. If this property is not sold within the next thirty (30) days, the price will increase to $500.00 per front foot for the 85 feet on Western Avenue. I have one or two other men who are communicating with me about the sale of this property and it does not make any difference with me who buys this property but thirty (30) days from date the price will increase." On January 31st Allen again wrote Dailey and after referring to Dailey's letter of the 18th instant and making certain inquiries as to the dimensions of the property, stated: "We did not ask if you would be willing to give any terms,—now if we can get a man who will pay down part, and seven per cent on the balance, would you consider such a proposition? If so, and you will write us at once and give us the best terms that you are willing to make under these conditions it will aid us materially. I do not think our party would want to carry it very long. We would also be glad if you could give us a little more time on this, as you will realize that by the time your letter reaches us the time of your terms in the former letter will have almost expired." There were no further negotiations until February 15, 1923, when Allen wired Dailey as follows: "Your letter January 18th. Have sold eighty-five by two hundred Western Avenue frontage for forty thousand eight hundred dollars less eight hundred dollars commission and title expenses. Five thousand dollars have been deposited in escrow today. Purchaser agrees to pay fifty-eight hundred dollars at close of escrow. Balance mortgage thirty thousand dollars payable ten thousand on or before one year twenty thousand on or

before three years interest seven per cent quarterly. Wire confirmation at once my expense.'' The next day Dailey replied thereto by telegram as follows: ''I have explained in my letter that Western Ave. property was Eighty-five by one hundred fifty that Sierra Vista was fifty by one hundred eighty-five. That price of Western Ave. was forty thousand net to me. Purchaser to assume ten thousand mortgage will take ten thousand cash and mortgage for twenty thousand payable in three years seven per cent cannot accept present offer.'' On the day following, February 17th, Allen again wired ''Your wire sixteenth is accepted Will send papers through escrow department for your signature''; and on February 19th Dailey wired: ''Sorry to say that I sold property before receiving your message.''

Supplementing the foregoing documentary evidence Allen testified that he was not acquiring the property on his own account, but that he had secured two purchasers named Kerr and Martz, who had agreed to pay $40,000 net to Dailey for the property and an additional $800 to him as a commission, and that no arrangement had been made for a subsequent transfer of the property to him by the purchasers. The evidence further shows that on February 15, 1923, in furtherance of such agreement, Kerr, as the agent of Dorothy Sadler, deposited $5,000 in escrow under instructions providing, among other things, that on or before 30 days thereafter, in consummation of the conveyance of said property, she would deposit an additional $5,800, and in payment of the balance of the purchase price would execute and deliver to the owner a note secured by a mortgage on the property for $30,000, at seven per cent, $10,000 of which would be made payable in one year and $20,000 in three years; that if she failed to pay the additional $5,800 as agreed Allen should be paid a commission of $800 out of the $5,000 then on deposit; but that she reserved the right to withdraw the deposit of $5,000 after noon of February 18, 1923, if the sale of the property was not confirmed by the owner, in which event no commission was to be paid. After the receipt of Dailey's telegram of February 16th, to wit, on February 20th, new escrow instructions were signed which were substantially the same as the first in providing for an additional payment of $5,800, but unlike the first instructions provided for the execution and deliv-

ery of a first mortgage of $10,000 to one Hancock and a second mortgage to Dailey of $20,000 in payment of the balance of the purchase price, instead of one note and mortgage to the owner for $30,000. This latter change in the escrow, providing for the execution of a mortgage to Hancock, was apparently made to conform to the terms of Dailey's telegram of February 16, 1923, to the effect that the purchaser should assume the existing $10,000 mortgage on the property. With reference to Dailey's final telegram of February 19, 1923, the record discloses that counsel for appellant admitted at the trial that contrary to the assertion made in said telegram Dailey had not sold the property prior to the receipt of Allen's telegram of acceptance.

Appellant endeavors to bring the case within the scope of an agency which prevents the agent by reason of fiduciary relations arising out of the employment from dealing with the property of his principal in his own right or as the agent of others. In this regard appellant claims ''that all the correspondence, acts and circumstances surrounding this transaction upon which the action is founded conclusively establish that plaintiff was actually representing the defendant in procuring a purchaser or else the plaintiff falsely and deliberately created the impression by his correspondence that he was representing appellant, which constituted fraud of such a character as will defeat plaintiff's right to successfully maintain this action.''

It is doubtless true that if the agency be the ordinary one wherein the agent is employed to obtain for his principal the highest possible price for the property beyond a fixed minimum, for which service the agent is to be paid a commission on a percentage basis, fiduciary relations arise out of such employment which preclude the agent from becoming the purchaser of the property or acting for others and thus unduly profiting to the injury of his employer.

But it appears to be well settled also that where, as here, an owner authorizes the sale of his property by an agent for a fixed price net to him with the understanding that the agent selling the same shall be entitled to any excess thereover as a commission or shall look to the purchaser for the payment of the same, the agent may without violating any trust relationship purchase the property on his own account or act as the agent of others in acquiring

314

the same. (*Hutton* v. *Sherrard,* 183 Mich. 356 [L. R. A. 1915E, 976, 150 N. W. 135]; *Synnott* v. *Shaughnessy,* 2 Idaho (Hasb.), 122 [7 Pac. 82]; *Synnott* v. *Shaughnessy,* 130 U. S. 572 [32 L. Ed. 1038, 9 Sup. Ct. Rep. 609, see, also, Rose's U. S. Notes]; *Wolverton* v. *Tuttle,* 51 Or. 501 [94 Pac. 961]; *Beatty* v. *Russell,* 41 Neb. 321 [59 N. W. 919]; Warvelle on Vendors, p. 274.) The two agencies mentioned differ widely from each other because in the former the contract fixes the minimum price and a percentage basis of compensation for the agent, as a result of which the principal profits by any price received for the property in excess of the minimum; whereas under the latter agency the principal profits nothing beyond the net price fixed, and consequently it becomes immaterial so far as the principal is concerned to whom the property is sold or for what price it is sold above the minimum. As stated in Warvelle on Vendors at page 275, the agent will not "be allowed to purchase where he has a duty to perform which is inconsistent with the character of the purchaser, nor to speculate for his private gain with the subject matter committed to his care. This may be regarded as the true extent of the rule; and an agent placing himself beyond it may lawfully contract with his principal with relation to the property."

The correspondence above set forth shows beyond question, we think, that the agency created thereby falls within the rule of the cases above cited which allows the agent to deal with the property on his own account or as the agent or trustee for others, because Dailey's telegrams and letters expressly stated that all he wanted for the property was $40,000 net to himself and that it did not make any difference to him who the purchaser might be; and therefore, Allen having consummated the transaction in his own name without disclosing the identity of the parties for whom he was acting, it would seem clear that he was entitled to maintain an action in his own name to require specific performance by the vendor even though he was not the real party in interest. In this regard section 369 of the Code of Civil Procedure provides that an executor or administrator, or trustee of an express trust, or a person expressly authorized by statute, may sue without joining with him the persons for whose benefit the action is prose-

cuted; and that a person with whom, or in whose name, a contract is made for the benefit of another, is a trustee of an express trust, within the meaning of this section. ■ And as held in the case of *Allen* v. *Chatfield,* 34 Cal. App. 785 [168 Pac. 1149], the reason for the exception established by said section readily reaches the case of an agent contracting in his own name for an undisclosed principal or group of principals, and that when an agent contracts with another as principal the law allows the agent treated as principal to sue in his own name on the contract, whether the fact of the agency was or was not known to the other contracting party. The decision in the case cited further declares that manifestly the code section was intended to embrace not only formal trusts declared by deed, *inter partes,* but all cases in which a person, acting in behalf of a third party, enters into a written express contract with another, either in his individual name without description, or in his own name expressly in trust for or on behalf of or for the benefit of another, by whatever form or expression such trust may be declared; and it includes not only a person with whom but one in whose name a contract is made for the benefit of another. (*Considerant* v. *Brisbane,* 22 N. Y. 389.) It furthermore holds that a person with whom or in whose name a contract is made for the benefit of another is a trustee of an express trust and is authorized to sue without joining with him the persons for whose benefit the action is prosecuted (*Walker* v. *McCusker,* 71 Cal. 594 [12 Pac. 723]), and that while the real beneficiaries of the contract might in due time and in their names have proceeded to secure its benefits, the rights of the trustee remain unaffected (*Horseshoe Pier Co., etc.,* v. *Sibley,* 157 Cal. 442 [108 Pac. 308]).

In the present case, therefore, although as between the real purchasers and Allen the latter was acting merely as a trustee, such fact did not concern Dailey because he knew no one in the transaction but Allen, and consequently so far as Dailey was concerned Allen was the real party in interest and accordingly was entitled to enforce the contract in his own name (*Walker* v. *McCusker, supra; Allen* v. *Chatfield, supra*).

■ Appellant further contends that even upon the assumption that Allen is the real party in interest the alleged

contract sued upon is lacking in mutuality and therefore is unenforceable. In the case of *Harper* v. *Goldschmidt,* 156 Cal. 245 [134 Am. St. Rep. 124, 28 L. R. A. (N. S.) 689, 104 Pac. 451], it is held that "in equitable theory the requirement of mutuality of remedy is satisfied when the non-signing plaintiff enters suit, since by the very bringing of his action he binds himself to abide by the decree of the court in chancery and so empowers that court to decree specific performance against him." Mr. Pomeroy in his work on Equity Jurisprudence (2d ed., vol. 5, sec. 2191) states the same rule more elaborately as follows: "So far as there is a principle of mutuality, it is a mutuality of remedy in equity at the time of filing the bill that is required, and not a mutuality in the terms of the contract when the contract is made. . . . Where a contract for the sale of lands is signed only by the defendant, it is clear that the plaintiff need never have performed his agreement. There was a clear lack of mutuality in the terms. Yet it was early held that the contract could be enforced against the party who had signed. The modern cases all agree upon the point. . . . The filing of the bill makes the remedy mutual . . . " And in the early case of *Vassault* v. *Edwards,* 43 Cal. 458, the same rule is adhered to, the court there saying: "The courts, however, in view of the uniform construction of the Statute of Frauds, that the agreement was valid and binding upon the party by whom it was signed, and in order to work out the requisite mutuality, held that in such cases it was sufficient if the *remedy* was mutual. It was accordingly held from an early day that when the action for a specific performance was instituted by the party who had not signed the agreement, the act of filing the bill made the remedy mutual." (Citing numerous cases.)

█ It would seem clear, therefore, that under the authorities above quoted there is no merit in appellant's contention that the contract in question is fatally lacking in mutuality, for even though said contract was unilateral at the time Allen accepted Dailey's offer, Allen afterward made the remedy mutual by filing suit for specific performance. True, the decree rendered requires as a condition precedent to the delivery of the vendor's deed that Allen and not the real purchasers pay the sum of $10,000 in cash, assume the

existing mortgage of $10,000, and execute and deliver to appellant a promissory note and mortgage in the sum of $20,000 secured by the property conveyed. But the imposition of such requirements on Allen instead of the real purchasers is immaterial because as said in *Montgomery* v. *DePicot,* 153 Cal. 509 [12 Am. St. Rep. 84, 96 Pac. 305], which was an action for specific performance, it is a matter of general knowledge that upon sales of real estate a mortgage back for a portion of the purchase price is one of the most common methods of dealing in such transactions, and under such circumstances the mortgage covering the land sold is 'the main thing relied upon, and the financial responsibility of the vendee is a matter of very little importance to the vendor. Therefore, as in that case held, where, as here, the contract calls merely for a mortgage to secure a promissory note, without specifying a personal obligation, such provision will be construed as making the giving of the mortgage, and not the giving of the note, the material inducement to the contract. In the case before us Dailey declared, as already pointed out, that he did not care who the purchaser was, and it would follow therefrom that he neither required nor expected the personal obligation of any particular person to insure the payment of the balance of the purchase price, but was satisfied to accept a mortgage on the land.

The additional points made by appellant including the alleged variance between the contract pleaded and the one proved, and the asserted insufficiency of the escrow, do not in our opinion possess sufficient merit to require special notice.

After giving full consideration to all of appellant's contentions, it is our conclusion that the evidence is legally sufficient to sustain the findings and the judgment, and therefore the judgment is affirmed.

Tyler, P. J., and Parker, J., *pro tem.,* concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on June 30, 1928, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 26, 1928.

All the Justices present concurred.