[Civ. No. 23517. First Dist., Div. Four. Feb. 29, 1968.]

JOSEPH LOUGHLIN et al., Plaintiffs and Appellants, v. IDORA REALTY COMPANY et al., Defendants and Respondents.

Clarke Weigand for Plaintiffs and Appellants.

Lempres & Seyranian, Stanley Anthony Shulster and Roderic Duncan for Defendants and Respondents.

RATTIGAN, J.—According to the allegations of the complaint, this action arises from a fraudulent real estate transaction wherein, as a result of false representations made to plaintiffs by their real estate broker, their property was sold to the broker's mother-in-law without their knowing her identity, and was immediately sold to others at a significantly higher price. The action was brought to recover secret profits

allegedly made by all defendants in the transaction, plus interest and punitive damages.

Plaintiffs Joseph Loughlin and Frances Loughlin, husband and wife, commenced the action against the broker, George Turkmany, individually and doing business as Idora Realty Company; "Eloise Turkmany, also known as E. Mejia," alleged in the complaint to be "in some manner related" to Turkmany; and John Casserly, alleged to be a real estate salesman in Turkmany's employ. Four defendants—George Turkmany, Eloise Turkmany, E. Mejia and Casserly— appeared by answer. It was established at pretrial that Eloise Turkmany was George Turkmany's wife, and that E. Mejia was his mother-in-law.

After a nonjury trial the court made detailed findings of fact, in narrative form, in favor of all four defendants. The first several findings were as follows (with some typographical changes, and with numerals added):

"[1] On or about June 7, 1961 and prior thereto plaintiffs were the owners of the real property, improved with a residence, at 5028 Webster Street, Oakland, California; plaintiffs resided in Los Angeles and said residence was rented to George Haggerty. [2] On said date plaintiff J. W. Loughlin, hereinafter referred to as Loughlin, entered the offices of defendant George Turkmany, hereinafter referred to as Turkmany, doing business as Idora Realty Company, a licensed real estate broker, and requested that said office list his property for sale and find a buyer for it.

"[3] Turkmany and his salesman, defendant John Casserly, hereinafter referred to as Casserly, were not present and in their absence Mrs. Hitchcock, a saleswoman of said firm, prepared a net sales contract for signature by Loughlin which he signed on that date. [4] Said contract provided that Loughlin granted to Turkmany and his agents, for a period of 90 days from date thereof, the exclusive right to sell and dispose of said property for the sum of $14,000 net cash to Loughlin and as compensation for the services of the broker Loughlin agreed to pay said firm all money over the said net sum for which said property may be [sic] sold.

"[5] Loughlin requested Mrs. Hitchcock to indicate on the contract that Casserly was to be credited with the listing and his name was so listed on the firm. [Sic: "form"?] [6] Loughlin at that time informed Mrs. Hitchcock that he wanted all cash and would not accept any offer which required that he receive a note secured by deed of trust. [7] He wanted $15,000 for the property and after computing the

commission of 6% to be paid to the broker he agreed to accept $14,000 net cash. [8] Neither Turkmany, Casserly nor Mrs. Hitchcock made any representation to Loughlin prior to, or at the time of the signing of the contract, regarding the value of the property or the price Loughlin should ask for it.

"[9] . . . [After June 7, 1961] . . . Turkmany and his agents attempted to sell the property for Loughlin and on or about August 14, 1961 Turkmany sent a letter to Loughlin and his wife informing them he had an all cash offer for $11,000, the property to be sold 'as is' thereby avoiding a termite inspection and any possible termite repairs. [10] Loughlin was requested to sign an acceptance to the written offer enclosed if satisfactory to him; [11] the offer was made by E. Mejia, mother-in-law of Turkmany. [12] Loughlin rejected the offer and returned the offer unsigned.

"[13] Loughlin came to Oakland on or about August 21, 1961 and talked to Casserly, stating that he would not accept any offer of $11,000; he and Casserly discussed the sale of the property further and Casserly asked Loughlin if he would accept an offer of $12,000 which would net him $11,280 cash. [14] Loughlin stated he might consider it and Casserly so informed Turkmany after Loughlin departed for Los Angeles."

The foregoing narrative (Findings 1 through 14, inclusive) covers the evidence for the period from June 7 through the month of August 1961.[1] These findings reflect undisputed facts, or were made by the trial court upon conflicting evidence, and are binding upon this court in either event. Concerning some events which immediately followed in early September, the trial court next found as follows:

"[15] On September 5, 1961, Turkmany phoned Loughlin to confirm the fact Loughlin would accept $11,280 net cash and Loughlin told Turkmany he would accept such an offer. [16] Turkmany then prepared for signature by Loughlin a letter dated September 6, 1961, which was sent to Loughlin on said date for signatures of Loughlin and his wife in which they agreed to accept $11,280 net cash for the property for a total sales price of $12,000, the broker to receive $720 as a commission. [17] The buyer was E. Mejia, mother-in-law of Turkmany. [18] On September 5, 1961 Turkmany ordered a preliminary title report from Western Title Co., Order No. 626121, and [19] on September 6th informed the title com-

---

[1]All dates and events hereinafter mentioned occurred in 1961.

pany escrow officer, Joseph Lauck, that he had a buyer for the property.''

According to uncontradicted evidence, the events of early September, involving Turkmany and Loughlin, were these: On September 5, Turkmany opened an escrow at Western Title Insurance Co. under No. 626121. The title company's ''Order Blank,'' a filled-in form evidencing this transaction, was received in evidence.[2] The form shows that Turkmany ordered a preliminary title report, and specified title insurance in the amount of $14,000, in connection with a sale of the 5028 Webster Street property by Loughlin to Mejia. The form referred only to a ''sale'' and ''$14,000''; it did not mention any other amount, nor any person other than Loughlin and Mejia, nor terms, nor financing.

Thereafter, on the night of September 5 and again on the night of September 6, Turkmany telephoned Loughlin in Los Angeles. In the September 6 call, he told Loughlin that he had a $12,000 offer for the property. Turkmany, according to his testimony, was acting as agent for Mejia in communicating the offer, but there is no evidence that he disclosed this fact to Loughlin in the telephone conversation. In response to an inquiry by Loughlin, Turkmany said that he—Turkmany—was not buying the property, but he did not say that Mejia was, nor that she was his mother-in-law.

In the September 6 telephone conversation, Loughlin verbally agreed to accept $12,000 for the property: $11,280 cash net to plaintiffs, with Turkmany to receive the $720 balance as a commission. On the same night, Turkmany drafted a document dated Steptember 6, and mailed it to Loughlin for plaintiffs' signature and return. A covering letter stated in relevant part, in Turkmany's handwriting, that ''I will proceed to open the escrow'' when the signed document was returned. Plaintiffs signed the document—apparently on September 7—and mailed it back. The document, which was in letter form, stated in relevant part as follows:

''September 6, 1961

''Idora Realty Company
[address]

---

[2]The order blank shows two dates, September 5 and September 7. To the extent that the trial court found (Finding No. 18, quoted *supra*) that the transaction occurred on September 5, the finding stands because it was made upon conflicting evidence. The trial court did not find (*id.*) that Turkmany ''opened an escrow'' in the September 5 transaction, but the contents of the order blank—which, among other things, designated an ''escrow officer''—demonstrate that he did, and there is no evidence to the contrary.

Attention: Mr. George Turkmany

"RE: Our real property known as 5028 Webster Street Oakland, California.

"Dear Sir:

"This is to confirm our telephone conversation of last night and the telephone conversation we had this evening that we will accept the sum of $11,280.00 NET CASH To Us for our above mentioned property. . . . [Instructions follow for payment of an outstanding indebtedness to the Bank of America and for closing the transaction]

"s/ Joseph W. Loughlin

"s/ Frances Loughlin"

Neither Turkmany's covering letter, nor the September 6 document, identified the buyer of the property. On September 15, the title company sent a deed to plaintiffs, naming "E. Mejia" as the buyer. They signed and returned the deed on September 16 and returned it to the title company.

The next successive findings by the trial court generally reflect these facts: Shortly following the telephone conversation of September 6, Turkmany obtained from one Azaro a commitment for a loan of up to $12,500 on the property, the loan to be made to Mejia. Soon thereafter, Turkmany negotiated a sale of the property from Mejia to the Messrs. Schennek for $16,500, but upon terms: $2,000 cash down, a $12,500 loan from Azaro to be secured by first deed of trust, and the balance to be carried by a note from the Schenneks to Mejia, to be secured by a second deed of trust.

The Mejia-Schenneks sale was placed in the same escrow (No. 626121) where the sale from Loughlin to Mejia was already pending. The entire escrow closed on September 20, with consecutive recordation of the Loughlin deed to Mejia, a deed from her to the Schenneks, and a deed of trust from the Schenneks in Azaro's favor.

The title company disbursed $11,280 to plaintiffs, less the balance of the bank loan owed on the property. Mejia received the Schenneks' note for $2,000, plus a check for about $1,200. The note and the check were delivered to Turkmany, who deposited the check in his trustee account. According to Turkmany, this account contained other funds which Mejia had accumulated by investments made through him. Turkmany also received a $720 commission from the Loughlin sale, of which he paid $360 to Casserly. He also "charged" the Mejia account with a commission for his services to her in the transaction.

According to the uncontradicted evidence, plaintiffs were not told at any time before the escrow closed, and did not learn until thereafter, that Mejia was Turkmany's mother-in-law, nor that a successive sale by Mejia to anyone else, at any price or upon any terms, was being negotiated or transacted.

The trial court further found "That the allegations of fraud in plaintiffs' complaint are not true and that defendants did not obtain or receive a secret profit nor make false and fradulent representations to plaintiffs." In this regard, plaintiffs' complaint had originally alleged that they were induced to sell their property for $11,280 net as a result of several false representations made to them by Turkmany. According to the complaint, these included false representations that termite repairs would cost $2,500 and that a prospective street widening project would take some of the property. The trial court's general finding that defendants "did not . . . make false and fraudulent representations to plaintiffs" rejected plaintiffs' contentions in these specific respects and, in such respects, the general finding is supported by the evidence.

Plaintiffs' complaint had also alleged, however, that they were induced to sell for $11,280 by Turkmany's further false representations "that $12,000 was the highest and best price that could be obtained for the property; . . . [and] . . . that he was not buying it himself, but had a bona fide offer for $12,000 less six per cent real estate broker's commission . . . ." We hold that, in these and related respects, the evidence sustains plaintiffs' position on the appeal and that, for specific reasons which will appear, the judgment must be reversed.

Speaking—on the appeal—to the undisputed fact that Turkmany did not disclose to plaintiffs the identity of the person who was to buy the property for $12,000 ($11,280 net to plaintiffs), defendants point out that Turkmany's agreement with plaintiffs was a "net sale contract."

A net sale contract (or "net listing") is one in which the principal agrees to accept a specified net price for the property to be sold, and the agent's compensation for negotiating a sale is to be any amount received in excess of the specified figure. (*Allen* v. *Dailey* (1928) 92 Cal.App. 308, 310-311, 313-314 [268 P. 404]; *Hiss* v. *Mulholland* (1929) 96 Cal.App. 121, 126 [273 P. 859]; *Pascal* v. *Cotton* (1962) 205 Cal.App.2d 597, 598, 600 [23 Cal.Rptr. 357]. See *Abell* v.

*Watson* (1957) 155 Cal.App.2d 158 [317 P.2d 159].) Defendants rely upon the rule that an agent with a net sale contract has no fiduciary duty to disclose the buyer's identity to the principal, even if the agent is buying the property himself. (*Allen* v. *Dailey, supra,* at pp. 313-314; *Hiss* v. *Mulholland, supra; Pascal* v. *Cotton, supra,* at p. 600; 1 Witkin, Summary of Cal. Law (7th ed. 1960) Agency and Employment, § 30, p. 408.)

██ ██▪ The trial court found (Nos. 3 and 4, quoted *supra*) that the June 7 agreement was a "net sale contract"; and, as we have seen, this finding is supported by the evidence. The court made no such finding as to the "contract" dated September 6. The latter (to which we hereinafter refer as the "September 6 contract," although plaintiffs signed it somewhat later) was not in terms a "contract" between Turkmany and plaintiffs. It did not, in fact, expressly provide for Turkmany's services or for payment to him of the verbally-agreed $720 commission. However, it resembled the "contract" in *Allen* v. *Dailey, supra* (92 Cal.App. 308 at p. 311), and it was a "net sale contract" within the meaning of the *Allen* rule. However, although each of the two agreements was a net sale contract, the *Allen* rule—under the circumstances of this case—had no application under either of them.

The June 7 contract did not define the rights and duties of the parties, because its 90-day term expired on September 5 (Civ. Code, § 10; Gov. Code, § 6800) and it did not control Turkmany's conduct thereafter. The *Allen* rule would not, in any event, have applied to it. The theory of the rule is that the principal cannot be injured by the agent's failure to disclose the buyer's identity because the latter fact is immaterial if the principal realizes the full net sale price he had agreed to accept. (*Allen* v. *Dailey, supra,* 92 Cal.App. 308 at p. 314; 1 Witkin, *supra,* at p. 408.) Plaintiffs did not realize the $14,000 specified in the June 7 contract, and the rule would not apply to that agreement because the theory's factual premise did not exist.

The *Allen* rule rests upon the further factual premise that the principal must have determined the net sale price without influence by the agent. (*Pascal* v. *Cotton, supra,* 205 Cal.App. 2d 597 at pp. 600-601; 1 Miller & Starr, Current Law of California Real Estate (1965) 216-217.) As to the June 7 contract in the present case, the trial court so found. (Nos. 7-8, quoted *supra*.) The evidence does not show, however, that

the $11,280 net price in the September 6 contract was determined by plaintiffs in their independent judgment.

In this regard, the evidence does not support the trial court's finding (No. 15) that on September 5 "Turkmany telephoned Loughlin to confirm the fact Loughlin would accept $11,280 net cash . . ." Turkmany so testified, but there is no evidence that such was "the fact": as the trial court had previously found (Nos. 13-14), Loughlin had told Turkmany's salesman that he might consider $11,280, not that he "would accept" it. According to the events of early September as shown by the evidence, Loughlin did not agree to sell for $11,280 net until Turkmany told him among other things he had a $12,000 offer for the property. A critical fact, therefore, was whether Turkmany's representations influenced Loughlin in this respect. The trial court did not make a finding negating this fact, and in the absence of such finding the *Allen* rule has no application to the September 6 contract.

Furthermore, the *Allen* rule operates to limit the agent's duty of disclosure to his principal when—but not until—the parties have entered into a net sale contract. In the present case, the September 6 contract did not materialize until after Turkmany communicated with Loughlin in early September. His duties to plaintiffs at that time were defined by his relationship with them at that time, and were not limited by the net sale contract agreed upon thereafter. The *Allen* rule, in other words, applies where there is a net sale contract, but not to the negotiations which preceded it.

Since neither of the successive net sale contracts operated to limit Turkmany's duties to plaintiffs,[3] we are required to assess what his duties were and whether he discharged them.

When Turkmany called Loughlin on September 5, he was still in an express contractual relationship with plaintiffs under the earlier contract. On September 6, that contract having expired by its terms, the express relationship had terminated. The telephone call on September 6, however, was apparently a continuation of the call on September 5; there is

---

[3]Despite the rule of *Allen* v. *Dailey, supra* (92 Cal.App. 308 at pp. 313-314)—that an agent with a net sale contract is under no fiduciary duty to disclose the buyer's identity to his principal—some authorities indicate that nondisclosure violates a fiduciary duty which will at least warrant disciplinary action by the Real Estate Commissioner against the nondisclosing agent. (See *Abell* v. *Watson, supra,* 155 Cal.App.2d 158 at p. 160; 1 Miller & Starr, *supra,* at pp. 216-217 ["'The 'net listing.' '"].) However, the *Allen* rule is apparently still the law of California (*Pascal* v. *Cotton, supra,* 205 Cal.App.2d 597 at p. 601); and, since we hold that it is inapplicable to the present case, we are not called upon to re-examine it.

no evidence that the parties discussed or considered the materiality of the current calendar date; and the subject discussed involved—and produced—a continuing principal-agent relationship between them. It therefore appears that Turkmany's calls to Loughlin on both dates were communications from a real estate agent to his principal, and that his duties to plaintiffs on both occasions are to be defined accordingly.

■ A real estate agent is a fiduciary. His obligation of diligent and faithful service is the same as that imposed on a trustee. (Civ. Code, § 2322, subd. 3; *Rattray* v. *Scudder* (1946) 28 Cal.2d 214, 222-223 [169 P.2d 371, 164 A.L.R. 1356]; *Rodes* v. *Shannon* (1963) 222 Cal.App.2d 721, 725 [35 Cal.Rptr. 339].)

■■ The real estate agent has, among other duties, the duty (1) to refrain from making any misrepresentation to his principal (Civ. Code, § 2228; Bus. & Prof. Code, § 10176, subds. (a), (c); *Caro* v. *Savage* (1962) 201 Cal.App.2d 530, 541 [20 Cal.Rptr. 286]); and (2) to make to the principal "the fullest disclosure of all material facts concerning the transaction that might affect the principal's decision" (*Rattray* v. *Scudder, supra,* 28 Cal.2d 214 at p. 223; *Menzel* v. *Salka* (1960) 179 Cal.App.2d 612, 622 [4 Cal.Rptr. 78]; Rest. 2d Agency, § 381).

■■ The real estate agent has the further duty (3) to disclose to the principal all offers to buy the property in addition to the offer accepted (*Simone* v. *McKee* (1956) 142 Cal. App.2d 307, 311-312 [298 P.2d 667]; *Hickson* v. *Gray* (1949) 91 Cal.App.2d 684, 685-687 [205 P.2d 420]; Annotation, "Liability of real-estate broker or agent to principal for concealing or failing to disclose offer," 7 A.L.R.3d 693) and (4) to refrain from dual representation in a sale transaction without full disclosure to both principals and their knowledge and consent. (*McConnell* v. *Cowan* (1955) 44 Cal.2d 805, 809-810 [285 P.2d 261, 482]; *Vice* v. *Thacker* (1947) 30 Cal.2d 84, 90-91 [180 P.2d 4]; *Anderson* v. *Thacher* (1946) 76 Cal.App.2d 50, 68 [172 P.2d 533].)

With respect to Turkmany's performance of these duties, we next address evidence which is virtually uncontradicted and which is shown or substantiated by Turkmany's own testimony, as follows:

■ (1) *Possible misrepresentations.* Turkmany testified that he told Loughlin on September 6 that he had a $12,000 offer for plaintiffs' property. There is no evidence that he ever received a $12,000 offer from anyone, and his use of the

figure "$14,000" in opening the escrow on September 5 imports that an offer, if there had been one, was for the higher sum. He also wrote Loughlin on September 6 that he would "proceed to open the escrow" when plaintiffs had returned their signed agreement to accept $11,280 net. To the extent that this statement implied that no escrow had been opened, the statement could have amounted to a misrepresentation.

(2) *Disclosure of material facts.* If Turkmany's written reference to an escrow did not amount to an affirmative misrepresentation, his failure to mention the escrow opened on September 5 could clearly have amounted to nondisclosure of a material fact which—particularly with its reference to "$14,000" in title insurance—might have affected plaintiffs' decision to sell for $11,280 net. According to his testimony, Turkmany also knew—and did not disclose to Loughlin—that the proposed buyer was Turkmany's mother-in-law.

 A current treatise expresses the view that, although a real estate agent must disclose the fact that he is buying his principal's property himself, "the California courts have not, as yet, expressly set forth the extent to which this rule will apply" where the buyer is among the agent's "relatives, friends or employees." (1 Miller & Starr, *supra,* at p. 157. See also California Real Estate Sales Transactions (Cont. Ed. Bar 1967) 157 [discussion by the same authors].) In *Abell* v. *Watson, supra,* 155 Cal.App.2d 158, however, the court upheld disciplinary action against a real estate salesman for failure to disclose to his principal that the proposed buyer was the salesman's sister and that the actual buyer, taking from escrow as the sister's nominee, was his wife. The *Abell* court stated (p. 160):

"To hold otherwise would be to approve a practice by which a real estate broker or salesman could himself purchase a client's property without his knowledge, by having it conveyed to the wife or other relative of the broker or salesman. This would open the door to all sorts of chicanery and double dealing, and would be contrary to the purpose and intent of the real estate law.

"The rule is to be found in . . . [*Adams* v. *Herman* (1951) 106 Cal.App.2d 92, 99-100 (234 P.2d 695)] . . . taken from 2 American Jurisprudence, page 208, section 257:

" ' "The general principle which denies the agent the right, without the knowledge and consent of the principal, to become the purchaser of property which he is employed to sell for the principal is aimed at an indirect or collusive sale or transfer,

as well as a direct sale or transfer to the agent. *It precludes the agent from selling or conveying to the agent's spouse*, to a corporation in which the agent has a large concealed interest, indirectly to himself in the name of a third person, and even to a clerk of the agent who is engaged in the affairs of the vendor relating to the sale of the land.''' (Italics are in the reported decision.)''

We conclude that, where the seller's real estate agent is obligated to disclose to his principal the identity of the buyer, and where the buyer is not the agent but occupies with him such blood, marital or other relationship which would suggest a reasonable possibility that the agent could be indirectly acquiring an interest in the property himself, such relationship is a ''material fact'' which the agent must disclose to his principal. If, as the text writers state (1 Miller & Starr, *supra,* at p. 157; California Real Estate Sales Transactions, *supra,* at p. 157), this is not the settled rule in California, it should be: and we hold that it is. (See *Rodes* v. *Shannon, supra,* 222 Cal.App.2d 721, 722, 726; *Caro* v. *Savage, supra,* 201 Cal.App.2d 530, 535, 536-537; *Estate of DeHart* (1961) 196 Cal.App.2d 452, 455-456 [16 Cal.Rptr. 603]; *Abell* v. *Watson, supra,* 155 Cal.App.2d 158 at p. 160; *Adams* v. *Herman* (1951) 106 Cal.App.2d 92 at pp. 99-100 [234 P.2d 695]; *Anderson* v. *Thacher, supra,* 76 Cal.App.2d 50, 57, 73; *Firestone* v. *O'Brien* (1929) 97 Cal.App. 43, 47-49 [274 P. 1006]; 3 Am.Jur.2d, § 228, p. 601; Annotation, ''Duty of real-estate broker to disclose that prospective purchaser is a relative,'' 26 A.L.R.2d 1307.)

(3) *Disclosure of offers.* If Turkmany had a $14,000 offer from Mejia when he opened the escrow on September 5, he failed to disclose it to plaintiffs; and he did not disclose to them the $16,500 offer from the Schenneks which he negotiated but which was accepted by Mejia. Of the Schennek offer, Turkmany testified that he did not disclose it to plaintiffs because they were disinterested in any offer which was not for an all-cash price. But the payment of only $2,000 was to be deferred under the Schennek offer; with the financing arranged by Turkmany for his mother-in-law, the Schennek offer would have produced $12,500 cash, and it appears to have been a better offer than the $12,000 cash offer he had disclosed to plaintiffs.

(4) *Dual representation.* Turkmany expressly testified that he was acting as Mejia's agent when he communicated her alleged $12,000 offer to Loughlin on September 6, but there is no evidence that he disclosed this fact to plaintiffs.

The trial court, apparently having concluded that Turkmany had no fiduciary duty to plaintiffs because the June 7 agreement was a net sale contract, did not find that he was plaintiffs' agent in and after early September. As we have seen, the evidence indicates that he was; and, if he was, the question of whether he discharged his duties as such required findings concerning his conduct as shown by the evidence detailed above. ■■■ Where the fiduciary relationship of agency has been established, and where the principal questions the agent's actions, the agent bears the burden of showing that he acted in good faith and discharged the duties imposed upon him (*Estate of DeHart, supra,* 196 Cal.App.2d 452, 455) ; otherwise he will be held liable to the principal for all ''benefits and advantages'' he acquired from the agency. (*Crogan* v. *Metz* (1956) 47 Cal.2d 398, 404-405 [303 P.2d 1029].)

Under the evidence of Turkmany's actions in September, and in the absence of findings, supported by the evidence, that he was not acting as plaintiffs' agent at the time or that he discharged his duties as their agent, the burden cast upon him has not been met. For want of such findings, the judgment must be reversed.

■■■ However, the state of all the evidence—which is ambiguous and incomplete in many respects, and much of which is at variance with the pleadings—is such that this court is not able to make findings in favor of plaintiffs and against Turkmany nor, if we could, to assess damages. Consequently, we are required to remand the cause for new trial.

The case against Mejia, Casserly and Eloise Turkmany was pleaded and tried upon the theory that each conspired with Turkmany to defraud plaintiffs. The rule here invoked is that if through fraud and conspiracy another person assists a real estate broker in violating his fiduciary obligation to his principal by making a secret profit and retaining the proceeds therefrom, such person is liable for the consequences to the extent of his participation. (*Hickson* v. *Gray, supra,* 91 Cal. App.2d 684 at pp. 686-687.) Little or no proof was offered concerning the knowing complicity of any of the other three defendants. However, the evidence suggests—although we do not hold—that Mejia was a ''dummy'' for Turkmany in the transaction, and it shows that both Casserly and Eloise Turkmany received money or property in its course. The liability— if any—of them can be determined upon retrial. We therefore remand for new trial against all four defendants.

The pretrial conference order under which this case was

tried stated that the issues were "1. Are the defendants or any of them guilty of fraud upon the plaintiffs? 2. If so, which defendants and damages if any. 3. Are plaintiffs entitled to punitive damages; if so, in what amount?" For purposes of further proceedings, we hold that each and all of these issues are still to be resolved. However, if plaintiffs desire to amend factual allegations of their complaint in any respect material to the views expressed herein, they should be permitted to do so, defendants should be permitted to answer, and the cause should be retried upon the pleadings thus amended.

The judgment is reversed and the cause is remanded for new trial against all defendants.

Devine, P. J., and Christian, J., concurred.