[Civ. No. 27552. First Dist., Div. Two. Oct. 26, 1971.]

LLOYD S. SMITH, Plaintiff, Cross-complainant and Appellant, v. L. ED ZAK et al., Defendants, Cross-defendants and Respondents.

## COUNSEL

Rogers, Vizzard & Tallett and John H. Tallett for Plaintiff, Cross-complainant and Appellant.

Nielsen, Townsend & Hales and Stephen L. Blick for Defendants, Cross-defendants and Respondents.

## OPINION

**TAYLOR, Acting P. J.**—Plaintiff, Lloyd Smith, appeals from an adverse judgment in his consolidated actions for fraud, rescission, declaratory relief, and to quiet title against respondents, L. Ed Zak and Marjorie W. Zak, to a parcel of property that is the subject of a pending condemnation action.[1] Smith contends that the trial court failed to properly consider and apply the law with respect to the fiduciary duties of a real estate broker to his client, and, therefore, erred in its rulings on the exclusion of certain evidence. We have concluded that the judgment must be reversed for retrial.

The record indicates that in 1953, Smith, a retired switchman who lived in Redding, acquired for $6,600, a 2.34-acre parcel located between Burton Avenue and Wanda Lane near San Jose. In February 1964, Smith visited his Santa Clara property and decided to put it on the market again. As it had been common knowledge since 1961 that the state was building a freeway in the vicinity of Wanda Lane, Smith contacted the state to see if it was ready to condemn the property. Smith was told that the state would be interested in acquiring some or all of his property, but not for at least five years.

Smith was not acquainted with any real estate brokers in Santa Clara County but went into the Zak office on nearby Bascom Avenue and dis-

---

[1]Smith's cross-complaint against Zak in the condemnation action (No. 179682) was severed and consolidated with his complaint in No. 188458 for trial; the condemnation action is still pending. The principal relief requested was recovery of the property, or in the alternative, for the condemnation award and damages for fraud.

cussed the listing with Zak. In July 1959, Smith had listed the property for $30,000 with another broker, and had this figure in mind. In August 1963, Smith mentioned that he wanted to sell his property for $16,000 to Mr. Ross, a neighbor of his property who met and talked to Smith only on that occasion. Smith informed Zak of the pending condemnation and indicated he merely wanted to double his investment. Zak recommended a listing price of $15,950. Based on Zak's advice, the parties reached an oral understanding that Smith's property would be listed for $15,950.

On February 27, 1964, Zak opened an escrow with the title company, giving his own name as the prospective purchaser of the Smith property, and began a correspondence with the state Department of Highways concerning the use of the property as a storage yard. Zak received a letter dated March 11, 1964, from Frank Kane, a right-of-way agent, stating: "It appears that a fairly substantial portion of your parcel will be required for freeway construction. However, we have reviewed the proposed use that you intend to make of the right of way area (developed as a storage and equipment yard) and it appears that this proposed use will have a minor influence on the future cost of right of way.

"It therefore appears in order for you to develop your property for storage and equipment yard use. It should, however, be understood that a condition of our not objecting to this development is that no permanent structures be placed within the future right of way area." The preliminary design map accompanying Kane's letter indicated that the proposed highway extended along Wanda Lane.

On March 14, 1964, Zak mailed a six-month exclusive listing agreement to Smith who signed it, relying on Zak's advice. The $15,950 listing price conformed to Zak's representation as to the value of the property and provided for a real estate commission of 10 percent of the first $5,000 and 6 percent of the balance on completion of the sale. Shortly after the execution of the written listing agreement, Zak contacted Smith by phone to arrange a personal meeting in Redding, as Zak had a prospective purchaser who was willing to pay $10,500 for the property. Smith refused to consider the sale at that price. Zak did not disclose the name of the purchaser to Smith at this time, but testified at the trial that it was Kenneth D. Martin. In March 1964, Martin was applying for a real estate salesman's license under the sponsorship of Zak, but, according to Zak, never operated as a salesman out of Zak's office. Martin was a personal friend of Zak's and had sold several airplanes to him.

Although Zak admittedly had made no effort to advertise Smith's property, he wrote to Smith on May 25, 1964, stating that he had done so and

had a buyer who, like the first party, was a contractor and wanted to use the property for a storage area. There was no further activity until July when Zak telephoned Smith and told him he had a prospective purchaser at a price of $13,000. Zak advised Smith that this was the best offer he could get and advised him to sell at that time.

On July 16, 1964, a deposit receipt was prepared, naming Kenneth D. Martin, a licensed real estate salesman, or his nominee, as purchaser. Zak never informed Smith of his friendship with Martin or his sponsorship of Martin's license. In addition to acknowledging a $100 deposit, the sale price of $13,000, and the commission provision, the deposit receipt provided: "1. Buyer to place in escrow the balance of purchase price being $12,900.00 within 15 days[2] of this contract.

"2. Buyer has read letter written by Frank J. Kane, right of way agent for the State of Calif. as to the future requirements of the highway dept. and seller shall be released from all obligations thereunder." The deposit receipt also contained the following handwritten notation: "Seller is to net $12,000 as per phone call. L.E.Zak" and was initialed "K.M." and signed by Kenneth Martin. At the trial, Martin testified that he had initialed the deposit receipt but would not confirm his signature on the document in the escrow file indicating that Zak was to take title to the property.

The deposit receipt was mailed to Smith, who signed and returned it. Zak handled the escrow instructions which called for: 1) a blank deed that was forwarded to Smith; 2) the insertion of Zak's name and that of his wife as purchasers after the deed was returned by Smith. Smith executed the deed on July 28, 1964, and returned it to the title company, which inserted Zak's name as purchaser and also prepared a purported assignment of the property to Zak. Zak deposited the amount required to close the transaction, less the $866 commission that he normally received on the sale of property to a third party. The transaction closed and the deed was recorded with revenue stamps indicating a purchase price of $40,000.

Immediately thereafter, Zak engaged in further activity to expedite the purchase of the property by the state. As indicated above, even prior to obtaining the written listing from Smith, Zak, representing that he was the owner of the property, had contacted the state as to its freeway plans, and received the letter dated March 11 referred to in the deposit receipt. Zak applied to the county for a partial subdivision of the three lots fronting on

---

[2]There is a conflict in the evidence as to whether the 15-day provision was inserted for Smith's convenience or Zak's, and whether or not Zak told Smith that if Martin could not come up with the cash for the balance of the purchase price in the 15-day period, Zak would buy the property himself.

Wanda Lane. His subdivision application, dated December 1964, was approved by the County Planning Commission, subject to several conditions, including: "9. If the State agrees to purchase all or any part of the subject lands, it shall void this approval."

Smith's expert, Clevenger, testified that in 1964, the property had a fair market value of $40,600. To arrive at this conclusion, Clevenger utilized comparable sales of properties not subject to condemnation that sold from approximately $16,000 to $28,800 per acre. Clevenger also considered the subsequent sale of an adjacent parcel for $75,000 in February 1965. This parcel was about the same size as the Smith parcel and was also subject to condemnation for the freeway. Clevenger stated that the threat of condemnation was not a comparability factor as the threat of condemnation does not change the value of property.

Zak's expert, Griffiths, indicated that the $13,000 (or about $5,500 an acre) paid by Zak was fair, as Smith could not expect to receive the market value of the property from a buyer who was aware of the threat of condemnation. Griffiths' supporting data consisted of the comparable sale of a 2.45-acre parcel in December 1961 for $20,000. Griffiths explained that this parcel had sold for a higher price than Smith's property as the 1961 buyer had no knowledge of the prospective freeway.

Smith did not become aware of the fact that Zak had purchased the property for his own account until December 1966. At that time (about 2½ years after the transaction), Smith was contacted by representatives of the state who attempted to verify Zak's alleged price of $40,000.

The court excluded the following items of evidence proffered by Smith: as a result of Zak's activities with the county planning commission, Zak was orally advised early in 1965 that the state wished to acquire the property. He received a letter dated January 11, 1965, indicating that the state intended to acquire the property immediately. At that time, Zak asserted that the value of the property was at least $1.00 per square foot, or a total in excess of $100,000. In June 1965, Zak was advised that the state was having the property appraised and was contacted by the state's appraiser. Zak had told Martin that the Smith property was one to gamble on to make money, and that if the threat of condemnation could be relieved and the property used for a convalescent hospital, it would have a value of about $1.00 a square foot. In 1966, the state filed its complaint in eminent domain. Zak's verified answer to the state's condemnation action indicated that the value of the property was $105,000.

The court also excluded testimony in Zak's deposition taken by the state

on October 4, 1966, indicating that: 1) when Zak purchased the property in July 1964, he planned to develop it for a medical center or convalescent hospital; 2) Zak told representatives of the state that he had paid $40,000 for the Smith property and had purchased for $49,950 and $40,000 an acre two other nearby properties, neither of which was as good as the parcel that he had acquired from Smith.

The court found: About March 14, 1964, Smith entered into an exclusive listing agreement with Zak for a price of $15,950 that was agreed upon by mutual consent with full knowledge of all the facts and circumstances concerning the property. At that time, the state had indicated its intention to acquire a substantial portion or all of the property but the size and date of acquisition were indefinite. As the property was unimproved and burdened by several easements, the only feasible use was a temporary one for a storage yard that would involve the removal of trees and leveling of the property.

Prior to the expiration of the listing agreement, Zak fully informed Smith concerning the prospective purchaser, Martin, and the price offered. Zak also indicated to Smith that if Martin could not come up with the cash purchase price within the specified 15-day period, Zak would himself buy the property and guarantee Smith a net of $12,000. Smith agreed to all of these terms.

Martin was unable to fund the cash purchase price within the 15-day period and Zak fully performed his guarantee agreement by purchasing the property for $12,000 (net) to Smith. The price received by Smith for the property was the fair market value of the property. Smith was entirely satisfied with the terms of the sale and expressed no dissatisfaction until he was contacted by a representative of the state as to the price paid by Zak.

Zak did not misrepresent to Smith any fact concerning the value of the property, the identity of the purchaser, or any other material matter. Zak, a licensed real estate broker and salesman, did not intend to and did not act in any way as to take advantage of his position or deal improperly or unfairly with Smith and violated no provisions of the Business and Professions Code.

■ The obligations imposed on a real estate agent are the same as those imposed on a trustee (Civ. Code, § 2322, subd. 3; *Rattray* v. *Scudder,* 28 Cal.2d 214, 222-223 [169 P.2d 371, 164 A.L.R. 1356]). Thus, all transactions between a broker and his client by which the broker obtains any advantage are presumed to be without sufficient consideration (Civ. Code, § 2235).

■   A real estate agent must: 1) refrain from making any misrepresentations to his principal (Civ. Code, § 2228; Bus. & Prof. Code, § 10176, subds. (a), (c)); 2) make to the principal the fullest disclosure of all material facts concerning the transaction that might affect the principal's decision (*Rattray* v. *Scudder, supra; Menzel* v. *Salka,* 179 Cal.App.2d 612, 622 [4 Cal.Rptr. 78]; Rest.2d, Agency, § 381).

The real estate agent has the further duty, 3) to disclose to the principal all offers to buy the property, in addition to the offer accepted (*Simone* v. *McKee,* 142 Cal.App.2d 307, 311-312 [298 P.2d 667]), and 4) to refrain from dual representation in a sales transaction without full disclosure to both principals and without their knowledge and consent (*Anderson* v. *Thacher,* 76 Cal.App.2d 50, 68 [172 P.2d 533]).

■   When the acts of an agent have been questioned by his principal and the fiduciary relationship has been established, the burden is cast on the agent to prove that he acted with the utmost good faith toward his principal and that he made a full disclosure prior to the transaction of all the facts relating to the transaction under attack (*Timmsen* v. *Forest E. Olson, Inc.,* 6 Cal.App.3d 860, 871 [86 Cal.Rptr. 359]).

■   The trial court did not give sufficient weight to the above rules in its exclusion of the evidence detailed above. Smith had established the existence of the fiduciary relationship and that in 1966 Zak attempted to sell to the state for $100,000 a parcel of property that he had acquired from Smith 2½ years earlier for only $13,000, although the deed carried revenue stamps indicating a price of $40,000.

Smith, as an uninformed and unsophisticated layman, accepted at face value the statements of the state's agents that his property would not be condemned for at least five years and informed Zak of this fact, and also accepted Zak's recommendation for a $15,950 listing price. Within six months after he acquired the property, Zak, an experienced broker, filed a partial subdivision application with the county and almost immediately received the expected response, namely, that the state was interested in acquiring the property. In a proper exercise of his responsibilities as a fiduciary, Zak should have suggested and undertaken on behalf of Smith the subdivision application activity.   ■   Furthermore, the trial court's exclusion of evidence relating to Zak's subsequent conduct and his opinions and representation concerning the value of the property in 1966 were contrary to the well established rules that permit the admission of subsequent statements and conduct to prove an antecedent fraud (*Bradley* v.

*Osborn,* 86 Cal.App.2d 18, 22 [194 P.2d. 53]). █ Here, the revenue stamps indicating a purchase price of $40,000 and the fact that even prior to the execution of the written listing contract, Zak had opened an escrow with the title company and made inquiries of the state, indicating that he was the owner of the property, was indicative of Zak's intent at the time he acquired the property from Smith.

The record indicates that at the same time that Zak indicated to Smith that the $13,000 price was the best price that he could obtain for the property, Zak mentioned to Martin the profitable use of the property for a convalescent hospital at a value of about $100,000. The uncontroverted evidence indicates that Zak did not disclose to Smith the facts of his personal and professional relationship with Martin or that Zak was himself the actual purchaser of the property. In accord with the well settled rule that a real estate agent must disclose the fact that he is buying his principal's property himself, this court (Division Four) recently held in *Loughlin* v. *Idora Realty Co.,* 259 Cal.App.2d 619 [66 Cal.Rptr. 747], that among the material facts an agent must also disclose to his client is the fact that the buyer is one who occupies a close relationship to the agent. █ Although in Loughlin the undisclosed buyer was the mother-in-law of the broker, the court's reasoning is equally applicable here. The court said at page 631: "We conclude that, where the seller's real estate agent is obligated to disclose to his principal the identity of the buyer, and where the buyer is not the agent but occupies with him such blood, marital *or other relationship* which would suggest a reasonable possibility that the agent could be indirectly acquiring an interest in the property himself, such relationship is a 'material fact' which the agent must disclose to his principal. If, as the text writers state (1 Miller & Starr, *supra,* at p. 157; California Real Estate Transactions, *supra,* at p. 157), this is not the settled rule in California, it should be: and we hold that it is. [Citations.]" (Italics added.)

█ Martin's personal friendship and prior business dealings with Zak were undisputed. The uncontroverted evidence also indicates that at the very time of the listing agreement with Smith, Zak had sponsored Martin's application as a real estate salesman and had designated Martin as his employee in official state documents, Zak purported not to remember this fact, even though Martin was identified in the deposit receipt as a real estate salesman. Furthermore, Zak's lapse of memory could not vitiate the then applicable provisions of the Business and Professions Code (set forth in the footnote below)[3] which provided that the broker sponsoring a particular

---

[3]Section 10151: "Application for license as real estate salesman shall be made in writing to the commissioner. The application shall be signed by the applicant, and

salesman was to display and retain possession of the salesman's license. A proper exercise of the duty of acting in the highest good faith imposed by law on a broker requires the disclosure of these material facts. In addition, the fact that Zak may have paid a fair price for the property or that the property could not then have been sold for a greater price is a false factor, if full disclosure prior to the sale has not been made (*Adams* v. *Herman,* 106 Cal.App.2d 92, 98-99 [234 P.2d 695]).

Nor can it be argued here (as it was in *Loughlin* v. *Idora Realty Co., supra*) that Zak was not required to disclose the purchaser's identity to Smith as the transaction was in effect a "net sale." A net sale contract (or net listing) is one in which the principal agrees to accept a specified net price for the property to be sold, and the agent's compensation for negotiating a sale is to be any amount received in excess of the specified figure.

*Loughlin, supra,* also held that the rule that an agent with a "net sales" contract has no fiduciary duty to disclose the buyer's identity to the principal, even if the agent is buying the property himself (*Allen* v. *Dailey,* 92 Cal.App. 308, 313-314 [268 P. 404]) rests on the factual premise that the principal must have determined the net sale price without influence by the agent. Accordingly, the *Allen* rule operates to limit the agent's duty of disclosure to his principal *when but not until* the parties have entered into a *net sales contract.* Here, as in *Loughlin,* the completed contract did not materialize until after the agent's misrepresentations to the seller. Zak represented to Smith that he had a third party arms-length purchaser, Martin, who was willing to buy the property for the sum of $13,000, which in Zak's opinion was a fair price and Smith should accept as he was not likely to obtain a better one. Smith, who lived in Redding, far from his property in Santa Clara County, was not experienced in real estate dealings and relied on the advice of Zak.

shall be accompanied by the original real estate salesman's license fee and by the recommendation of the broker who is to be his employer, certifying that the applicant is honest, truthful and of good reputation."

Section 10160: "The real estate licenses of both broker and salesman shall be prominently displayed in the office of the real estate broker.

"The real estate salesman's license shall remain in the possession of the licensed real estate broker employer until canceled or until the salesman leaves the employ of the broker."

Section 10161: "Immediately upon the real estate salesman's withdrawal from the employ of the real estate broker, the real estate broker shall return the real estate salesman's license to the commissioner for cancellation. A license canceled but not suspended, or revoked may be reinstated at any time during the period for which the license was issued, upon receipt of application therefor, and the fee for the reinstatement of his license."

Section 10151 was amended in 1965. Section 10160 was amended in 1969, and section 10161 was repealed in 1968.

The judgment is reversed for retrial, with directions to the trial court to admit the excluded evidence as indicated in this opinion.

David, J.,* concurred.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.